Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

Argued April 17, 2003        Decided July 8, 2003

No. 02-5354

IN RE: RICHARD B. CHENEY,
VICE PRESIDENT OF THE UNITED STATES, ET AL.,
PETITIONERS

———————

Consolidated with
02–5355, 02–5356

———————

Appeals from the United States District Court
for the District of Columbia
(No. 01cv01530)
(No. 02cv00631)
(No. 02cv01530)

———————

On Petition for Writ of Mandamus

———————

*Gregory G. Katsas*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellants. With him on the emergency petition for writ of mandamus

———————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

were *Theodore B. Olson*, Solicitor General, *Paul D. Clement*, Deputy Solicitor General, *Shannen W. Coffin*, Deputy Assistant Attorney General, *Mark Stern, Michael S. Raab, Douglas Hallward–Driemeier*, and *Eric D. Miller*, Attorneys.

*Larry E. Klayman* and *Sanjay Narayan* argued the cause for appellees. With them on the response were *David G. Bookbinder*, *Alex Levinson*, and *Roger M. Adelman.*

Before: EDWARDS, RANDOLPH and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* EDWARDS.

Dissenting opinion filed by *Circuit Judge* RANDOLPH.

TATEL, *Circuit Judge*: The Vice President of the United States and others, all defendants in this suit under the Federal Advisory Committee Act, petition for a writ of mandamus vacating the district court's discovery orders, directing the district court to rule on the basis of the administrative record, and ordering dismissal of the Vice President as a party. Petitioners, however, have failed to satisfy the heavy burden required to justify the extraordinary remedy of mandamus: Their challenges to the district court's legal rulings can be fully considered on appeal following final judgment, and their claims of harm can, at least at this stage of the litigation, be fully cured in the district court. We therefore dismiss the petition. The Vice President has also filed an interlocutory appeal from the district court's rulings. We lack jurisdiction to entertain that appeal: The collateral order doctrine does not apply, nor does *United States v. Nixon*, where the Supreme Court entertained an interlocutory appeal because, unlike here, the district court had rejected a claim of executive privilege.

## I.

Shortly after his inauguration, President George W. Bush issued a memorandum establishing the National Energy Policy Development Group (NEPDG), a task force charged with "develop[ing] . . . a national energy policy designed to help

the private sector, and government at all levels, promote dependable, affordable, and environmentally sound production and distribution of energy for the future." Mem. Establishing National Energy Policy Development Group, Jan. 29, 2001. Established within the Office of the President and chaired by Vice President Richard B. Cheney, the task force consisted of six cabinet secretaries, as well as several agency heads and assistants to the President. *Id.* The memorandum authorized the Vice President to invite "other officers of the Federal Government" to participate "as appropriate." *Id.* Five months later, the NEPDG issued a final report recommending a set of energy policies. *See* NATIONAL ENERGY POLICY DEVELOPMENT GROUP, NATIONAL ENERGY POLICY: REPORT OF THE NATIONAL ENERGY POLICY DEVELOPMENT GROUP (2001), *available at* http://www.whitehouse.gov/energy/National-Energy-Policy.pdf.

On July 16, 2001, Judicial Watch, a nonprofit organization that seeks "to promote and protect the public interest in matters of public concern," Second Am. Compl. ¶ 3 (Judicial Watch Compl.), filed suit in the United States District Court for the District of Columbia against the NEPDG, the Vice President, other federal officials, and several private individuals, alleging that the NEPDG had failed to comply with the procedural requirements of the Federal Advisory Committee Act (FACA), 5 U.S.C. App. 2. Enacted to "control the growth and operation of the 'numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government,'" *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 902–03 (D.C. Cir. 1993) (*AAPS*) (quoting 5 U.S.C. App. 2, § 2(a)), FACA requires advisory committees to make public all reports, records, or other documents used by the committee, provided they do not fall within any Freedom of Information Act exemptions. Central to this case, FACA section 3(2) exempts advisory committees "composed wholly of full-time officers or employees of the Federal Government." 5 U.S.C. App. 2, § 3(2)(iii).

Although the President appointed only federal government officials to the NEPDG and authorized the Vice President to add additional "federal officials," Judicial Watch alleges that "non-federal employees, including Thomas Kuhn, Kenneth Lay, Marc Racicot, Haley Barbour, representatives of the Clean Power Group, and other private lobbyists . . ., regularly attended and fully participated in non-public meetings of the NEPDG as if they were members of the NEPDG, and, in fact, were members of the NEPDG." Judicial Watch Compl. ¶ 25; *see AAPS*, 997 F.2d at 915 (holding that the section 3(2) exemption does not apply if non-government officials' "involvement and role are functionally indistinguishable from those of the other members"). Brought pursuant to both the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and the All Writs Act, 28 U.S.C. § 1361, the complaint sought, among other things, a judgment declaring the defendants to be in violation of FACA and an order directing them to provide plaintiffs "a full and complete copy of all records . . . made available to or prepared for Defendant NEPDG," as well as "detailed minutes of each meeting of Defendant NEPDG . . . that contain a record of persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all report[s] received, issued, or approved by Defendant NEPDG." Judicial Watch Compl. at 22.

Before proceedings commenced in the district court, the Sierra Club, a nonprofit group seeking "to practice and promote the responsible use of the Earth's resources and ecosystems," filed a virtually identical lawsuit in the United States District Court for the Northern District of California. Compl. ¶ 3. The Sierra Club's suit was subsequently transferred to the district court here and consolidated with Judicial Watch's.

All defendants moved to dismiss, arguing, among other things, that FACA does not authorize a private cause of action, that the Vice President cannot be sued under the APA, and that "[a]pplication of FACA to the NEPDG's operations would directly interfere with the President's express constitutional authority including his responsibility to

recommend legislation to Congress and his power to require opinions of his department heads." Mem. in Support of Mot. to Dismiss at 3 (D.D.C. Mar. 8, 2002). Amplifying this latter point, defendants argued that "such an expansive reading of FACA would encroach upon the President's constitutionally protected interest in receiving confidential advice from his chosen advisers, an interest that is also rooted in the principle of separation of powers." *Id.* Although the district court agreed that no private cause of action exists under FACA and recognized that the Vice President cannot be sued under the APA, it ruled that FACA could be enforceable through mandamus. *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 219 F.Supp. 2d 20, 42 (D.D.C. 2002). Relying on the "fundamental principle of constitutional interpretation that a court should not pass on any constitutional questions that are not necessary to determine the outcome of the case or controversy before it," *id.* at 45, the district court deferred ruling on the government's separation of powers claim, explaining that "after discovery, the government may prevail on summary judgment on statutory grounds without the need for this Court to address the constitutionality of applying FACA [to the Vice President]," *id.* at 54–55. The court observed that, "while discovery in this case may raise some constitutional issues, those issues of executive privilege will be much more limited in scope than the broad constitutional challenge raised by the government here." *Id.* at 55.

After denying defendants' motion to dismiss, the district court approved plaintiffs' discovery plan and directed the government to "fully comply with the[ ] requests," "file detailed and precise objections to particular requests," or "identify and explain their invocations of privilege with particularity." Order Approving Disc. Plan at 2 (D.D.C. Aug. 2, 2002). In response and on behalf of all federal defendants except the Vice President, the government produced some 36,000 pages of documents. On behalf of the Vice President, the government filed a motion for a protective order, arguing that discovery against the Vice President would violate the separation of powers and seeking permission to file a motion for summary judgment based on the "administrative record."

According to the government, the administrative record consists of the President's memorandum creating the NEPDG, the NEPDG's final report, and an affidavit by Karen Knutson, Deputy Assistant to the Vice President for Domestic Policy. Submitted with the motion for a protective order, Ms. Knutson's affidavit declares that "[t]o the best of my knowledge, no one other than the officers of the Federal Government who constituted the NEPDG, the Federal employees whom they chose from their respective departments, agencies and offices to accompany them (all of whom were full-time Federal employees), and the Office of the Vice President personnel set forth above, attended any of the [NEPDG] meetings." Knutson Aff. ¶ 10.

Although the district court acknowledged that "[i]n APA cases, discovery is normally frowned upon," it stated that it would not consider a motion for summary judgment until after discovery, explaining that "this case isn't the typical case, where you have a significant administrative record." Tr. of Status Hr'g at 13:17–23 (D.D.C. Aug. 2, 2002). The court therefore denied the government's motion for a protective order and directed defendants to "produce non-privileged documents and a privilege log." Order Den. Mots. for Recons. and Protective Order at 1 (D.D.C. Oct. 17, 2002). The court informed the parties that it was considering either reviewing allegedly privileged information in camera or appointing a special master, such as a retired judge, to review privilege claims. Tr. of Omnibus Mots. Hr'g at 4:15–5:12 (D.D.C. Oct. 17, 2002).

Instead of responding to plaintiffs' discovery requests and filing a privilege log, defendants asked the district court to certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court declined, Mem. Op. and Order (D.D.C. Nov. 27, 2002), and defendants filed in this court an emergency motion for writ of mandamus pursuant to 28 U.S.C. § 1651 seeking an order "vacat[ing] the discovery orders issued by the district court, direct[ing] the court to decide the case on the basis of the administrative record and such supplemental affidavits as it may require, and direct[ing] that the Vice President be dismissed as a defendant." Emer-

gency Pet. for Writ of Mandamus at 20. The Vice President also filed a notice of appeal from the district court's order denying the motion to dismiss and from the various discovery orders. Plaintiffs opposed the mandamus petition and filed a motion to dismiss the interlocutory appeal. We granted an administrative stay and heard oral argument on April 17, 2003.

Now before us are the petition for a writ of mandamus and the plaintiffs' motion to dismiss the appeal. We address each in turn.

## II.

In considering the petition for a writ of mandamus, we are bound by well-established rules of both the Supreme Court and this court. "The remedy of mandamus," the Supreme Court has explained, "is a drastic one, to be invoked only in extraordinary situations." *Kerr v. United States Dist. Court*, 426 U.S. 394, 401 (1976) (internal citations omitted). "[O]nly exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of this extraordinary remedy." *Will v. United States*, 389 U.S. 90, 95 (1967). Emphasizing the rarity of mandamus relief, the Supreme Court noted that "our cases have answered the question as to the availability of mandamus . . . with the refrain: 'What never? Well, *hardly* ever!'" *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (emphasis in original).

In *Kerr*, the Supreme Court explained the policy underlying the limited nature of mandamus relief:

> [P]articularly in an era of excessively crowded lower court dockets, it is in the interest of the fair and prompt administration of justice to discourage piecemeal litigation. It has been Congress' determination since the Judiciary Act of 1789 that as a general rule 'appellate review should be postponed . . . until after final judgment has been rendered by the trial court.' A judicial readiness to issue the writ of mandamus in anything less than an extraordinary situation would run the real risk of defeating the very policies

sought to be furthered by that judgment of Congress.

*Kerr*, 426 U.S. at 403 (internal citations omitted) (ellipses in original).

Consistent with these principles, in determining whether mandamus is warranted, we consider "whether the party seeking the writ has any other adequate means, such as a direct appeal, to attain the desired relief," and "whether that party will be harmed in a way not correctable on appeal." *Nat'l Ass'n of Criminal Def. Lawyers, Inc. v. United States Dep't of Justice*, 182 F.3d 981, 986 (D.C. Cir. 1999). Petitioner "has the 'burden of showing that its right to issuance of the writ is clear and indisputable.' " *Gulfstream Aerospace Corp. v. Mayacama Corp.*, 485 U.S. 271, 289 (1988).

Our recent decision in *In re Executive Office of the President*, 215 F.3d 20 (D.C. Cir. 2000), not only demonstrates the strictness of the mandamus standard, but also largely controls the disposition of this case. There, plaintiff alleged, among other things, that President Clinton's personal staff and other White House units that advise and assist the President were maintaining FBI files of former political appointees in violation of the Privacy Act. The district court denied the government's motion to dismiss, ordered discovery, and rejected the White House's assertion of the attorney client, deliberative process, and work product privileges. The government then sought a writ of mandamus to vacate the district court's discovery order with respect to one particular interrogatory. The government also argued that without mandamus relief "the President's interactions with his closest advisors will be irreparably damaged in the future, because the District Court has sought to coerce the White House, on threat of criminal sanction, into following a view of the Privacy Act to which it does not subscribe." *Id.* at 24.

Noting that "[a]lmost the entire thrust of [the government's] petition is that the District Court erred in concluding that the White House is subject to the Privacy Act," we explained that "[e]ven assuming, arguendo, that the District

Court's holding on the scope of the Privacy Act is clear error, mandamus relief is not warranted in this case. This is so because, on the record at hand, there has been no showing of harm of the sort required to justify the drastic remedy of mandamus." *Id.* at 23. Further, although acknowledging that " 'disclosure [of highly privileged material] followed by appeal after final judgment is obviously not adequate in such cases—the cat is out of the bag,' " *id.* (bracketed material in original), we observed that "[i]n the normal course, . . . mandamus is not available to review a discovery order," *id.* We then denied the request for mandamus, explaining that the government "offered . . . no argument that it is even entitled to the privileges," and that "[a]bsent a viable claim that some important privilege will be infringed if discovery is allowed to proceed, this court has no jurisdiction to review the interlocutory order on this ground." *Id.* at 23–24. As to the government's fear that the district court might hold White House staff in criminal contempt, we explained, "the District Court has no free-wheeling authority to run the affairs of the White House with respect to matters that are not related to the instant case." *Id.* at 24.

With this case law in mind, we consider the petition for writ of mandamus. Petitioners first argue that by allowing broad discovery into "the inner workings of the executive including the Vice President," Emergency Pet. for Writ of Mandamus at 12, on nothing more than a "mere allegation of . . . unofficial non-government" participation in the work of the NEPDG, the district court has "brought to the fore the substantial constitutional questions it sought to avoid," *id.* at 14. Petitioners therefore ask that we direct the district court to decide the case on the basis of the administrative record. For two reasons, we may not do so.

First, as petitioners concede, plaintiffs' cause of action against the Vice President arises not under the APA, but under the Mandamus Act. 28 U.S.C. § 1361. *Cf. Chamber of Commerce v. Reich*, 74 F.3d 1322, 1326–28 (D.C. Cir. 1996) (explaining availability of "non-statutory review" even in the absence of a statutory cause of action). Moreover, even if APA review standards apply to mandamus actions—a question we need not resolve here—the rule that APA review is

generally limited to the administrative record has two exceptions: "when there has been a 'strong showing of bad faith or improper behavior' or when the record is so bare that it prevents effective judicial review." *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998) (internal citation omitted). Petitioners argue that plaintiffs have not made the "strong showing" required by the first exception. This is true, but plaintiffs do not invoke the first exception. Instead, they rely on the second exception, arguing that the record is inadequate to resolve the statutory issue pending before the district court. As they point out, the President's memorandum establishing the NEPDG and the NEPDG's final report tell us only that the NEPDG's members were all federal employees. The two documents reveal nothing about whether, notwithstanding the President's appointment of only federal officials, non-federal personnel participated in the work of the NEPDG "as if they were members of the NEPDG." Judicial Watch Compl. ¶ 25. Although the Knutson affidavit does address this question, because the government submitted it during litigation, it is not itself part of the administrative record. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) (administrative record does not include "litigation affidavits"); *Envtl. Def. Fund, Inc., v. Costle*, 657 F.2d 275, 286 (D.C. Cir. 1981) (rejecting creation of exception to *Overton Park* to allow parties challenging administrative action to submit affidavits addressing the merits of the agency decision).

As respondents point out, we faced a similar issue in *AAPS*. There, plaintiffs alleged that another presidential committee—President Clinton's Task Force on National Health Care Reform—failed to follow FACA's procedural requirements. We held that in determining the applicability of FACA section 3(2)'s exemption for meetings of full-time government officials, we would look beyond formal membership to whether persons described as consultants "may still be properly described as member[s] of an advisory committee if [their] involvement and role are functionally indistinguishable from those of the other members." *AAPS*, 997 F.2d at 915. To answer that question—essentially the same question

the district court faces here—we remanded for "expedited discovery." *Id.* at 916.

Second, and most important given the interlocutory status of this case, even were there some doubt about the district court's refusal to rely on the administrative record—indeed, even if, as petitioners insist, *AAPS* is distinguishable from this case and the district court's ruling amounts to "clear and significant error," Emergency Pet. for Writ of Mandamus at 5—petitioners are entitled to mandamus relief only if they face a risk of harm that cannot be cured in the district court. This is the teaching of the mandamus cases discussed above. Absent harm for which there is "no other adequate means . . . [of] attain[ing] the desired relief," *Nat'l Ass'n of Criminal Def. Lawyers*, 182 F.3d at 986, appellate courts may not grant mandamus relief from a district court's legal judgment even if that judgment constitutes "clear error," *In re Executive Office of the President*, 215 F.3d at 23. "[A]ny error—even a clear one—could be corrected on appeal." *Nat'l Ass'n of Criminal Def. Lawyers*, 182 F.3d at 987. Because this is equally true of petitioners' second challenge—that the district court erred by failing to dismiss the Vice President as a party—we turn to the key issue on which petitioners' entitlement to mandamus relief depends: Have they identified some "harm" flowing from the district court's challenged rulings that cannot be remedied either in the district court or on appeal following final judgment?

Petitioners' primary claim of harm is that "in the circumstances of this case, . . . extending the legislative and judicial powers to compel a Vice President to disclose to private persons the details of the process by which a President obtains information and advice from the Vice President raises separation of powers problems of the first order." Emergency Pet. for Writ of Mandamus at 4. Under the circumstances of this case, however, this argument is premature. Far from "order[ing] extensive disclosure of communications between senior executive branch officials and those with information relevant to advice that was being formulated for the President," Reply to Appellees' Resp. to Emergency Pet. for Writ of Mandamus at 1, the district court ordered defendants to

produce "non-privileged documents and a privilege log." Order Den. Mots. for Recons. and Protective Order at 1 (D.D.C. Oct. 17, 2002). Petitioners neither produced a privilege log nor, as directed by the district court's earlier order, did they invoke "privileges with particularity." Order Approving Disc. Plan at 2 (D.D.C. Aug. 2, 2002). If mandamus was inappropriate in *Executive Office of the President*, where the President had asserted but failed to justify asserted privileges, it is certainly unjustified here, where petitioners have yet to assert a privilege in the district court. "Absent a viable claim that some important privilege will be infringed if discovery is allowed to proceed, this court has no jurisdiction to review the interlocutory order." *In re Executive Office of the President*, 215 F.3d at 24.

Moreover, petitioners' concerns about the potential disclosure of privileged information are fully addressable in the district court or, if necessary, in a later proceeding here. If, in response to the district court's discovery order, petitioners choose to invoke executive or any other privilege, that court, keeping in mind the need to "accord[ ] high respect to the representations made on behalf of the President," *United States v. Nixon*, 418 U.S. 683, 707 (1974), may sustain the privilege, thus giving petitioners all the relief they seek here. *See Kerr*, 426 U.S. at 401 (denying mandamus petition challenging district court order rejecting broad state secrets privilege and allowing disclosure of state documents regarding prison-parole system because district court could review documents in camera to determine privilege's applicability). On the other hand, were the district court to reject a claim of executive privilege, thus creating an imminent risk of disclosure of allegedly protected presidential communications, then mandamus might well be appropriate to avoid letting "the cat . . . out of the bag." *In re Executive Office of the President*, 215 F.3d at 23–24; *see In re Papandreou*, 139 F.3d 247 (D.C. Cir. 1998) (granting mandamus relief of district court order that diplomats submit to depositions in order to review diplomats' assertion of immunity); *In re: Sealed Case*, 151 F.3d 1059 (D.C. Cir. 1998) (granting mandamus where district court's discovery order was insufficiently protective of secret

grand jury information). But so long as the separation of powers conflict that petitioners anticipate remains hypothetical, we have no authority to exercise the extraordinary remedy of mandamus. As we said in *Executive Office of the President*, "[i]n the normal course, . . . mandamus is not available to review a discovery order." 215 F.3d at 23.

Petitioners next argue that in order to protect the separation of powers, the "President should not be forced to 'consider the privilege question' in response to unnecessarily broad or otherwise improper discovery." Emergency Pet. for Writ of Mandamus at 15 (internal citation omitted). We see two answers to this argument. First, executive privilege is itself designed to protect the separation of powers. "The privilege," the Supreme Court explained in *United States v. Nixon*, "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708. Were we to hold, as petitioners and the dissent urge, that the Constitution protects the President and Vice President from ever having to invoke executive privilege, we would have transformed executive privilege from a doctrine designed to protect presidential communications into virtual immunity from suit. Yet, as the Supreme Court also held in *Nixon*, "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *Id.* at 707. Indeed, the Supreme Court has consistently held that because the President is not "above the law," he is subject to judicial process. *Id.* at 715; *see also Clinton v. Jones*, 520 U.S. 681, 703–04 (1997).

The second answer to petitioners' argument is that their worry about "unnecessarily broad" discovery can be resolved in the district court. According to petitioners, discovery is excessive because (1) they have already produced some 36,000 pages worth of documents and (2) the discovery "compelled by the district court would result in even more sweeping intrusions into the Vice President's office than would result from the remedies available if plaintiffs were to prevail on the

merits of their suit." Emergency Pet. for Writ of Mandamus at 4.

The district court has already addressed the first concern. In its order approving plaintiffs' discovery plan, the district court expressly stated: "[S]hould defendants believe that documents or information that they have already released to plaintiffs in different fora are responsive to these discovery requests, defendants shall bear the burden of identifying with detailed precision what information or documents have been so released, and to which discovery requests they believe the information or documents to be responsive." Order Approving Disc. Plan at 2 (Aug. 2, 2002). Petitioners have yet to avail themselves of this aspect of the district court's order.

Petitioners' second concern is well taken. If the district court ultimately determines that the NEPDG is subject to FACA, plaintiffs would be entitled to "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by [the] . . . committee." 5 U.S.C. App. 2, § 10(b). Yet plaintiffs' discovery seeks far more than these limited items. Their third interrogatory, for example, asks for the names of "all Task Force staff, personnel, consultants, employees, and all other persons who participated, in any manner, in the activities of the Task Force or the preparation of the Report." The fourth interrogatory asks "[f]or each person listed in response to Interrogatory 3, . . . please provide . . . a description of the person's role in the activities of the Task Force and in preparation of the Report." The requests to produce also go well beyond FACA's requirements. For example, the first request seeks "[a]ll documents identifying or referring to any staff, personnel, contractors, consultants or employees of the Task Force." As petitioners point out, if plaintiffs are entitled to "discovery . . . roughly coextensive with the available remedies for a FACA violation, then the textual exemption of advisory groups including only government officials, which presumably was designed to protect against undue interference with executive functions, has little practical effect." Emergency Pet. for Writ of Mandamus at 14.

Plaintiffs' discovery also goes well beyond what they need to prove, as they allege, that FACA applies to the NEPDG, i.e., that non-federal officials participated to the extent that they were effectively NEPDG members. For example, plaintiffs have no need for the names of "all . . . persons" who participated in the Task Force's activities, nor "a description of [each] person's role in the activities of the Task Force." They must discover only whether non-federal officials participated, and if so, to what extent. Nor do plaintiffs require "[a]ll documents identifying or referring to any staff, personnel, contractors, consultants or employees of the Task Force." Rather, they need only documents referring to the involvement of non-federal officials.

Although petitioners did raise the question of excessive discovery in the district court, they did so in support of their plea for a "protective order relieving [defendants] of *any* obligation to respond to plaintiffs' discovery." Mem. in Supp. of Defs.' Mot. for a Protective Order and for Recons. at 21 (D.D.C. Sept. 3, 2002) (emphasis added). As far as we can tell, petitioners never asked the district court to *narrow* discovery to those matters plaintiffs need to support their allegation that FACA applies to the NEPDG. Moreover, we are confident that the district court, whose pending discovery order invites petitioners to file "objections," will, consistent with the judiciary's responsibility to police the separation of powers in litigation involving the executive, respond to petitioners' concern and narrow discovery to ensure plaintiffs obtain no more than they need to prove their case.

In thus relying on the district court to protect petitioners from harm, we are following closely in the Supreme Court's footsteps in *Kerr*. There, the Court affirmed the Court of Appeals' denial of a writ of mandamus sought by a state agency challenging a district court's order granting a motion to compel discovery. Even though "the opinion below might be regarded as ambiguous," the Court explained, "we are fortified in our reading of it by a recognition of the serious consequences which could flow from an unwarranted failure to grant petitioners the opportunity to have the documents reviewed by the trial judge in camera before being compelled

to turn them over." *Kerr*, 426 U.S. at 405. The Supreme Court thus read the Court of Appeals' opinion as "providing petitioners an avenue far short of mandamus to achieve precisely the relief they seek." *Id.* at 404–05. "We are thus confident," the Court concluded, "that the Court of Appeals did in fact intend to afford the petitioners the opportunity to apply for and, upon proper application, receive in camera review." *Id.* at 406. We are equally confident that the district court here will protect petitioners' legitimate interests and keep discovery within appropriate limits—or as the district court itself put it, "tightly reined discovery." Mem. Op. and Order at 32 (D.D.C. Nov. 27, 2002).

In sum, petitioners have not satisfied the heavy burden necessary to obtain a writ of mandamus. Their legal challenges to the district court's refusal to proceed on the basis of the administrative record and to dismiss the Vice President can be fully addressed, untethered by anything we have said here, on appeal following final judgment. In the meantime, narrow, carefully focused discovery will fully protect the Vice President: Either the Vice President will have no need to claim privilege, or if he does, then the district court's express willingness to entertain privilege claims and to review allegedly privileged documents in camera will prevent any harm. Moreover, such measures will enable the district court to resolve the statutory question—whether FACA applies to the NEPDG—without "sweeping intrusions into the Presidency and Vice Presidency." Emergency Pet. for Writ of Mandamus at 8. And if after limited discovery, it turns out that no non-federal personnel participated as de facto NEPDG members, the district court will never have to face the serious constitutional issue lurking in this case—whether FACA can be constitutionally applied to the President and Vice President. If, on the other hand, the district court not only determines that FACA applies to the NEPDG, but also rejects petitioners' constitutional challenge to the application of the Act, both issues can be fully addressed on appeal following final judgment.

We end with some comments about the dissent. According to the dissent, *AAPS* is wrong, General Services Administra-

tion regulations preclude the de facto membership theory, the district court is without jurisdiction, and the case should be remanded with instructions to dismiss.  We may not reach these issues for several reasons.  To begin with, *AAPS* is circuit law binding on this panel.  As we have explained:

> The "decision of a [panel]" is "the decision of the court."  Were matters otherwise, the finality of our appellate decisions would yield to constant conflicts within the circuit.  One three-judge panel, therefore, does not have the authority to overrule another three-judge panel of the court.  That power may be exercised only by the full court, either through an *in banc* decision, or pursuant to the more informal practice adopted in *Irons v. Diamond*.

*LaShawn v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc) (internal citations omitted).  *See also Joo v. Japan*, No. 01–7169, slip op. at 13 (D.C. Cir. June 27, 2003) (panel of judges is bound by circuit precedent).

Even were we not bound by *AAPS*, we could not consider the dissent's arguments because petitioners raised not one of them—not in the district court, not in their appellate briefs, not even at oral argument.  Instead, petitioners argue that *AAPS* is distinguishable, not wrong;  they never mention the GSA regulations;  and they argue that the constitutional questions can be avoided by remanding to the district court with instructions to decide the case on the basis of the administrative record.  This court has long held that "[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."  *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).

Recognizing that appellate courts sit to resolve only legal questions presented and argued by the parties, the dissent maintains that we must nevertheless address these new arguments because they go to the jurisdiction of the district court.  Specifically, pointing out that the only viable claim against the Vice President rests on mandamus, the dissent argues that

given the constitutional concerns and the GSA regulations, plaintiffs have no " 'clear and indisputable' right to relief." Dissent at 2 (citation omitted). The defect in this argument is that it ignores *AAPS*. Because that decision holds that FACA permits a cause of action on the "de facto membership" theory, the district court "clear[ly]" has jurisdiction to entertain plaintiffs' mandamus action. Plaintiffs may or may not prevail, but under the law of this circuit, the district court's jurisdiction is not in doubt. According to the dissent's theory, moreover, all statutory defenses to mandamus actions become jurisdictional, allowing defendants who fail to prevail on motions to dismiss to seek immediate appellate review. Nothing in our case law supports such a result.

The arguments raised by the dissent are also premature. Following limited discovery, the district court may find, as the Knutson affidavit claims, that no non-federal personnel participated in the NEPDG's activities. That would end the case, leaving no need to address the constitutional issues raised by the dissent. If, on the other hand, discovery reveals some degree of participation by non-federal personnel, then the district court will have to decide whether that participation amounts to de facto membership. Only if the participation in fact amounts to such membership will the court have to resolve the constitutional issue—subject, of course, to appellate review following final judgment.

The dissent contends that mandamus relief is nevertheless required because even though petitioners have made no claim of privilege, the mere need to assert privilege will "distract[ ] and divert[ ] [the President] from the performance of his constitutional duties and responsibilities." Dissent at 8. This argument too is foreclosed by circuit precedent. As we held in *Executive Office of the President*, mandamus relief is inappropriate "[a]bsent a viable claim that some important privilege will be infringed if discovery is allowed to proceed." 215 F.3d at 24.

Finally, and contrary to the dissent, we are confident that this opinion fully responds to the constitutional arguments presented in this case. As we have explained, petitioners'

primary argument—that the broad discovery plaintiffs seek will violate the separation of powers—is premature. Petitioners have yet to invoke executive privilege, which is itself designed to protect the separation of powers, *see infra* p. 13, and the narrow discovery we expect the district court to allow may avoid the need for petitioners even to invoke the privilege. Petitioners also argue that applying FACA to the NEPDG would itself violate the separation of powers. As we have explained, resolution of this issue is also premature, for it assumes the answer to the question the district court has yet to resolve: Is the NEPDG a FACA advisory committee? Not until the district court answers that question and only if it determines that the NEPDG is in fact an advisory committee will that constitutional question be ripe for resolution. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 345–48 (Brandeis, J., concurring) (courts should only rule on constitutional issues as a last resort).

## III.

The Vice President's appeal of the district court's denial of the motion to dismiss and discovery orders requires little discussion. In general, only final orders are appealable. 28 U.S.C. § 1291. Circuit courts have jurisdiction over interlocutory appeals if the requirements of the collateral order doctrine apply, that is, if the challenged order "finally determine[s] claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

Largely for the reasons given above, none of the orders the Vice President seeks to appeal satisfies the collateral order doctrine. *See In re Sealed Case*, 151 F.3d at 1063 n.4 (describing similarities between tests for appellate review of interlocutory appeals under mandamus and collateral order doctrine). The Vice President does not argue otherwise. Instead, he asserts that we have jurisdiction to hear his

appeal pursuant to *United States v. Nixon*, 418 U.S. 683 (1974). There, the district court had approved subpoenas for audiotapes that President Nixon claimed were protected by executive privilege. Permitting an interlocutory appeal of this otherwise non-appealable order, the Supreme Court explained that it would be "unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the Government," to require President Nixon to follow the traditional path for perfecting his appeal, namely, " 'resist[ing] . . . [the court's] order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal.' " *Id.* at 691, 692 (quoting *United States v. Ryan*, 402 U.S. 530, 533 (1971)).

This case is very different. Because the Vice President has yet to invoke executive privilege, we are not confronted with the "unseemly" prospect of forcing him to choose between either (1) disclosing allegedly privileged information and appealing following final judgment after the "cat is out of the bag," or (2) refusing to disclose and going into criminal contempt in order to create an appealable order. Absent this constitutionally troubling choice, *Nixon* is inapplicable.

At oral argument, the government contended that applying *Nixon* to this case would amount to a "modest extension." Tr. of Oral Arg. at 5:10. We disagree. Including the Vice President's appeal within *Nixon*'s ambit would convert a narrow exception designed to protect fundamental privileges into a blanket exception to the collateral order rule in suits against the executive. This court has no authority to "extend" the law beyond its well-prescribed bounds.

## IV.

The petition for mandamus is dismissed and the motion to dismiss the appeal is granted.

*So ordered.*

EDWARDS, *Circuit Judge, concurring*: I concur in the majority opinion, because, in my view, it faithfully adheres to the law of the circuit and correctly decides the matter at hand. I also agree with the dissenting opinion insofar as it acknowledges that *Association of American Physicians and Surgeons, Inc. v. Clinton*, 997 F.2d 898 (D.C. Cir. 1993) ("*AAPS*"), is the law of the circuit and that the Government's position cannot withstand scrutiny under *AAPS*. We are bound to follow the law of the circuit. Therefore, the Government's petition must be denied.

The Government comes to this court seeking mandamus or collateral order review on an interlocutory appeal, to block discovery, *having never claimed that any of the disputed material is privileged and having never responded to the District Court's invitation to specify their objections to the disputed discovery orders*. The Government merely claims that interlocutory review is appropriate because this case implicates "separation of powers" issues. This is an extraordinary proposition. There is no legal authority of which I am aware – and the Government cites none – to support jurisdiction in this court.

I suspect that, on remand, the Government may be able effectively to challenge the breadth of the disputed discovery order. I also suspect that, once these objections have been raised, the District Court will tailor the discovery order. Until the Government voices its objections, however, this court has no jurisdiction to meddle in a dispute over a discovery issue that should properly be resolved by the District Court in the first instance.

Under 28 U.S.C. § 1291, discovery orders are appealable only after entry of final judgment in the underlying case, or under the "collateral order" doctrine upon entry of an order holding the litigant in criminal contempt. *See Byrd v. Reno*, 180 F.3d 298, 302 (D.C. Cir. 1999); *In re Kessler*, 100 F.3d 1015, 1016 (D.C. Cir. 1997). There clearly has been no final judgment in the underlying case here, and no criminal contempt order. The Government's only authority for asserting that the discovery order is appealable under § 1291 despite

the absence of a final order is *United States v. Nixon*, 418 U.S. 683 (1974). But, as the majority notes, *Nixon* is inapposite, because that case involved a situation in which discovery was ordered in the face of the President's assertion of *executive privilege*. The Government has asserted no privilege in this case. There is no other basis for an invocation of the collateral order doctrine in this case and the Government does not suggest otherwise.

Rather, this case focuses principally on the Government's request for mandamus relief. Mandamus "is reserved for *extraordinary circumstances* in which the petitioner demonstrates that his right to issuance of the writ is clear and indisputable and that no other adequate means to obtain relief exist." *Byrd*, 180 F.3d at 302. "[O]nly exceptional circumstances amounting to a judicial usurpation of power will justify the invocation of this extraordinary remedy." *Kerr v. U.S. Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 402 (1976) (citation and internal quotation marks omitted). Applying this well-understood test, the Government can point to no basis for mandamus at this juncture, because it can point to no harm. And it can point to no harm because it has yet to specify any privileged materials or otherwise cite objections for consideration by the District Court. It is not enough for the Government to come to this court and claim that discovery *may* expose materials that are protected by privilege or the deliberative process. It must first specify its objections so that they may be addressed by the District Court.

The Government suggests that interlocutory review is appropriate here, because the District Court is bound to consider only the "administrative record," *sans* discovery, with respect to any of plaintiffs' claims resting on the Administrative Procedure Act ("APA"). This argument is premised on an erroneous view of the law. In the Supreme Court's seminal decision in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), the Court made it clear that there are circumstances in which discovery or testimony by agency officials may be necessary and appropriate to resolve an APA claim arising in District Court. In that case, the

Supreme Court stated that judicial review was "to be based on the full administrative record that was before the Secretary at the time he made his decision. But since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence," the District Court could "require the administrative officials who participated in the decision to give testimony explaining their action." *Id.* And in *AAPS*, we found it entirely appropriate to remand for expedited discovery to determine whether a working group was an advisory committee under the Federal Advisory Committee Act ("FACA"). *See AAPS*, 997 F.2d at 915-16. In short, tailored discovery may be necessary to determine the question whether a disputed committee is subject to FACA's strictures.

The decision in *AAPS* is perfectly consistent with both *Overton Park* and the law of this circuit. In *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1 (D.C. Cir. 1998), this court plainly stated that judicial review properly may involve more than just the administrative record in an APA case "when there has been a 'strong showing of bad faith or improper behavior' *or* when the record is so bare that it prevents effective judicial review." *Id.* at 7 (emphasis added) (citing *Overton Park*, 401 U.S. at 420; *Community for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997-98 (D.C. Cir. 1990)). The dissent cites a Second Circuit case, *National Nutritional Foods Association v. FDA*, 491 F.2d 1141, 1145 (2d Cir. 1974), for the proposition that discovery into the internal workings of Government is not allowed without "strong preliminary showings of bad faith." But this is an incomplete characterization of *National Nutritional Foods*, which fully recognized that *Overton Park* did not necessarily and always require a showing of bad faith. *See id.*; *see also Overton Park*, 401 U.S. at 420 ("[W]here there are administrative findings that were made at the same time as the decision . . . there must be a strong showing of bad faith or improper behavior before such inquiry may be made. But here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves.").

*Overton Park* and *Commercial Drapery* make it clear that the exception to the rule of no discovery in APA cases is wider than bad faith. Thus, the absence of any showing of bad faith in this case is immaterial, because plaintiffs here seek discovery on the ground that the administrative record is inadequate for judicial review. And there is no serious doubt here – just as there was none in *AAPS* – that the bare administrative record does not allow for meaningful judicial review of plaintiffs' claim. Therefore, reasonable and carefully tailored discovery is legally permissible and entirely appropriate in this case. *See AAPS*, 997 F.2d at 915-16.

As the opinion for the majority correctly notes, this case is controlled by our decision in *In re Executive Office of the President*, 215 F.3d 20 (D.C. Cir. 2000). The Government cannot find a way around that precedent. Thus, there is absolutely no basis for our interlocutory review of the District Court's discovery orders, either under the collateral order doctrine or on a petition for mandamus, where the Government has asserted no privilege and has failed to specify any objections to the discovery orders. If, on remand, the District Court fails to tailor discovery pursuant to valid objections or assertions of privilege by the Government, then there may be a basis for appellate review. We are far from that point at this juncture of this litigation, however. Therefore, this appeal should be dismissed, because we have no jurisdiction to consider it.

I respectfully disagree with the dissent's argument that we should instead dismiss *plaintiffs*' case because the District Court lacks mandamus jurisdiction over plaintiffs' claim. As the dissent correctly acknowledges, *AAPS* is the law of this circuit, and we are bound by it, as is the District Court. Under *AAPS*, plaintiffs clearly had a basis for seeking relief in the District Court ordering the Government to comply with FACA. The dissenting opinion cites a General Services Administration ("GSA") regulation, 41 C.F.R. 101-6.1003 (2000), to suggest that the "*de facto* member doctrine" of *AAPS* is misguided. This argument might be tenable if the court in *AAPS* was obliged to give deference to GSA's interpretation of FACA. But the Supreme Court in *Public*

*Citizen v. U.S. DOJ*, 491 U.S. 440, 465 n.12 (1989), made it clear that any "assertion that GSA's interpretation of FACA's provisions is 'binding' confuses wish with reality." In any event, the cited GSA regulation surely does not take precedence over the law of this circuit on the matter here at issue. Under *AAPS*' "*de facto* member doctrine" – which is indisputably the law of the circuit – plaintiffs have a legal basis for seeking mandamus relief and the District Court in turn has mandamus jurisdiction over the claim.

Finally, most of the arguments raised in the dissenting opinion have never been presented to the District Court and they were not raised for consideration in the Government's brief to this court or in the oral argument before this court. In other words, the dissent's position rests on a view of FACA that has never been urged by the Government. "Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, or where 'injustice might otherwise result.' Suffice it to say that this is not such a case." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (citations omitted). The reason that a federal appellate court normally does not consider an issue not passed upon below is because parties, such as plaintiffs in this case, "should have the opportunity to present whatever legal arguments [they] may have in defense of the statute." *Id.* at 120. The dissent's theory of this case has not been propounded by the Government; it runs counter to the law of the circuit; and it relies on GSA regulations that the Supreme Court has said do not carry the force of law. In these circumstances, I can see no reasonable basis for this court to act *sua sponte* on a theory that has been neither raised by the parties nor addressed by the District Court.

For the foregoing reasons, I concur in the opinion for the majority.

RANDOLPH, *Circuit Judge, dissenting*: My disagreement with the majority is about not only its logic but also its starting points, one of the most prominent of which is derived from *Ass'n of American Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898 (D.C. Cir. 1993) (*AAPS*). There is a serious constitutional problem in *AAPS*'s interpretation of the Federal Advisory Committee Act (FACA), 5 U.S.C. App. § 1 *et seq.* – a problem this case exposes. As applied to committees the President establishes to give him advice, FACA has for many years teetered on the edge of constitutionality. *See* Jay S. Bybee, *Advising the President: Separation of Powers and the Federal Advisory Committee Act*, 104 YALE L.J. 51 (1994). The decision in this case pushes it over.

The case comes to us in a peculiar posture. We have mandamus on top of mandamus. Both sides have invoked the All Writs Act, 28 U.S.C. § 1361. The federal officers have petitioned this court for a writ of mandamus barring discovery. In the district court, plaintiffs sought a writ of mandamus ordering the federal officers to comply with FACA.[1] Mandamus, the majority tells us, is "drastic"; it is available only in "extraordinary situations"; it is hardly ever granted; those invoking the court's mandamus jurisdiction must have a "clear and indisputable" right to relief. These words are directed at the federal officers' petition in this court, but they apply equally to plaintiffs' suits in the district court. *See*

---

[1] Mandamus was the only basis upon which the actions could have proceeded in the district court. All agree that FACA does not itself create a cause of action. It is also clear that the Administrative Procedure Act, which plaintiffs invoked, does not apply. The alleged FACA "advisory committee" here was not an "agency" within the meaning of the APA. *See Meyer v. Bush*, 981 F. 2d 1288, 1297–98 (D.C. Cir. 1993). It was part of the Executive Office of the President. The President is not subject to the APA, and neither are units within the Executive Office whose sole function is to advise the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980).

Why the majority analyzes (maj. op. at 10) the adequacy of the administrative record in terms of the APA is therefore a mystery. Stranger still is the majority's insistence that there even must be an administrative record. *See supra* pp. 9–10.

*Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002). In my view, the federal officers have a clear right to relief in the court of appeals because the plaintiffs do not have a clear right to relief in the district court. I would therefore grant the writ and order the district court not only to bar discovery but to dismiss the actions.

"The President . . . may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices . . . ." U.S. CONST. art. II, § 2, cl. 1.

In January 2001 President Bush sought advice on energy policy. To that end, he established, in the Executive Office of the President, the National Energy Policy Development Group. The President named to this task force the Vice President; the Secretaries of Treasury, Interior, Agriculture, Commerce, Transportation, and Energy; the Director of the Federal Emergency Management Agency; the Administrator of the Environment Protection Agency; and three Assistants to the President. The President authorized the Vice President to invite "as appropriate, other officers of the Federal Government." The Group's mission was to "develop a national energy policy designed to help the private sector" and State and local governments, "to gather information, deliberate, and . . . make recommendations to the President." In May 2001 the Group issued its recommendations to the President. The Group's final report listed, as its members, the officials the President appointed in his January directive plus the Secretary of State and the Director of the Office of Management and Budget. *See* NATIONAL ENERGY POLICY DEVELOPMENT GROUP, NATIONAL ENERGY POLICY: REPORT OF THE NATIONAL ENERGY POLICY DEVELOPMENT GROUP (2001), *available at* http://www.whitehouse.gov/energy/National-Energy-Policy.pdf.

If the President's Energy Policy Group were an "an advisory committee" within the meaning of FACA, the President was required to make its membership "fairly balanced." 5 U.S.C. App. § 5(b)(2). If FACA applied, the Group should have filed a detailed "charter" with the General Services

Administration (GSA) before the Group began operating. *Id.* § 9(c). It should have held its meetings open to the public and allowed interested persons to file comments. *Id.* § 10(a)(1). It should have given notice of its meetings in the Federal Register. *Id.* § 10(a)(2). It should have kept detailed minutes of each meeting and "a complete and accurate description of matters discussed and conclusions reached." *Id.* § 10(c). And it should have made available to the public its "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda" and other documents. *Id.* § 10(b).

There is no doubt that these requirements would violate the separation of powers if they were imposed on all groups formed by the President for the purpose of providing him advice. *See* Bybee, *supra*. And so FACA contains an exemption for committees "established or utilized" by the President when the committees are "composed wholly of full-time … officers or employees of the Federal Government." 5 U.S.C. App. § 3(2). On the face of it, the Energy Policy Group, consisting only of high-level federal officials, was thus exempt from FACA.

But plaintiffs, relying on *AAPS*, alleged that the Group nevertheless was a FACA advisory committee. *AAPS* held that an outside consultant may "be properly described as a member of an advisory committee if his involvement and role are functionally indistinguishable from those of the other members," thus rendering the entire committee subject to FACA. 997 F.2d at 915. It is far from clear where the *AAPS* court derived its holding. No section of FACA was cited. The opinion purports to be interpreting the word "member," but the operative provision – quoted in the preceding paragraph – does not use that word. The *AAPS* court knew that an inquiry into functional equivalency would be fact-bound, and so it authorized discovery. *Id.* at 915–16.

It is this holding in *AAPS* that enabled plaintiffs – through allegations that private citizens were *de facto* members of the Energy Policy Group – to avoid a motion to dismiss, and it is this holding that led directly to the discovery order we have

before us. Judicial Watch's complaint names four private individuals and alleges that they "regularly attended and fully participated in non-public meeting of the [Energy Policy Group] as if they were members." Judicial Watch Compl. at 8–9. The Sierra Club's complaint is more general: it alleges that "[e]nergy industry executives, including multiple representatives of single energy companies, and other non-federal employees, attended meetings and participated in the activities of the Cheney Energy Task Force and Task Force Sub–Groups." Sierra Club Compl. at 6. The allegations are on information and belief.

Given *AAPS*'s formulation, extensive discovery into the Executive Office of the President is inevitable. Functional equivalency, as *AAPS* contemplated, invites a comparative judgment. One cannot know whether a private individual acted like a member of a Presidential committee unless one knows how the members acted. And so plaintiffs proposed, and the district court approved, free range discovery: interrogatories asking for descriptions of all the activities of all individuals – members and staff alike – who were involved in the work of the Energy Policy Group, and requests for documents detailing all communications between those working for the Group and their governmental departments with persons who were not full-time federal employees. The approved discovery plan also contemplates depositions.

My colleagues are confident that the district court can reign in the discovery, but I cannot see how this can be done in any non-arbitrary way. The *AAPS* opinion provides no standards. And my colleagues never articulate their conception of *de facto* membership. Left open is an extensive area to be explored in depositions, interrogatories, and document production. Consider just a few of the possibilities. Suppose it turns out that a private individual attended 6 of the Group's 12 meetings. Would that make him a *de facto* member? Would it matter if discovery revealed that some of the members the President appointed attended the same number of, or even fewer, meetings? What if the private individual attended all meetings but did not speak, or was present only for a short period each time? Would it matter whether the

private individual had a place at the table or sat on the side with the Group's staff? Or whether the private individual attended only a few meetings, but was quite influential in the formulation of the final recommendations? Should there be discovery into what impact the person's presence or statements had on the other members, and how would that discovery proceed? Suppose the private individual submitted memoranda or other documents. Is there to be discovery for the purpose of determining whether the other members of the Group took those documents into account in performing their information gathering function or in formulating their view of energy policy? (One of the complaints alleges that a corporate CEO handed the Vice President a three-page memorandum on the subject of energy.) Would it be of any consequence that the private person met individually with some of the members the President appointed? (There are also allegations to this effect.) And if so, is there to be discovery of who said what, and how this affected the work of the Group?

These problems and others are a direct result of *AAPS* and its lack of any principled standard for determining who is and who is not a *de facto* member of a Presidential committee. For the judiciary to permit this sort of discovery, authorized in the name of enforcing FACA – a statute providing no right of action, *see supra* note 1 – strikes me as a violation of the separation of powers. The intrusion into the inner workings of the Presidency, the disruption this intrusion is bound to entail, the probing of the mental processes of high-level Cabinet officers inherent in the type of discovery that *AAPS* sanctions, the deleterious impact on the advice the President needs to perform his constitutional duties – all this and more present "formidable constitutional difficulties," as the Supreme Court acknowledged in *Public Citizen v. Department of Justice*, 491 U.S. 440, 466 (1989); *see also id.* at 488 (Kennedy, J., joined by the Chief Justice and O'Connor, J., concurring in the judgment). In fact, I believe the "constitutional difficulties" here are even more "formidable" than they were in *Public Citizen*. Even outside the Executive Office of the President, courts do not allow this sort of discovery into

the internal workings of government departments without "strong preliminary showings of bad faith." *Nat'l Nutritional Foods Ass'n v. FDA*, 491 F.2d 1141, 1145 (2d Cir. 1974) (Friendly, J.). As we held in *Checkosky v. SEC*, 23 F.3d 452, 454, 489 (D.C. Cir. 1994) (opinion of Randolph, J.), unless there has been such a showing – here there was none – "agency deliberations, like judicial deliberations, are for similar reasons privileged from discovery," as are intra-agency memoranda and other documents recording how and why decisions or recommendations have been reached. "Requiring an agency to produce such internal materials and allowing litigants to depose agency officials . . . would be warranted only in the rarest of cases." *Id.*[2]

The majority and concurring opinions, citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971), insist that discovery is permissible here because the "administrative record" is inadequate. Those who forget the reason for a rule are apt to misapply it. I can think of no better illustration than what has occurred here. My colleagues have entirely ignored *why* the Supreme Court said it might be necessary to take testimony: the administrative record in *Overton Park* was not before the Court, and the administrative officials had not explained their action. This created a gap, a gap that needed filling because § 706 of the Administrative Procedure Act, 5 U.S.C. § 706, required the reviewing court to consider "the whole record" in determining whether the agency action was supported by substantial evidence. 401 U.S. at 419–20.[3] But in this case there is no

---

[2] None of the material sought in discovery here would be available through the Freedom of Information Act (FOIA). The Supreme Court held in *Kissinger v. Reporters Committee for Freedom of the Press* that FOIA does not cover "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." 445 U.S. 136, 156 (1980) (internal quotation marks omitted).

[3] "Even on those rare occasions when [discovery pursuant to *Overton Park*] is appropriate, the district court is not engaged in ordinary fact-finding, but instead is filling in gaps in the record to

gap in an administrative record. The Energy Policy Group was not an administrative agency; it was not required to make findings of fact and conclusions of law in order to enable judicial review under the APA; and the officials the President named to the group were not agency officials within the meaning of the APA. *See supra* note 1. Neither the district court nor this court would conduct judicial review under § 706 of the APA, yet that was the source of the *Overton Park* holding on which the majority relies.[4] *See supra* note 1. To state what remains of the majority's rationale is to refute it: because Presidential committees are not APA agencies there is no administrative record; therefore there must be discovery to compile an administrative record adequate for judicial review under the APA even though the APA does not apply and even though there will be no such judicial review.

The majority also maintains that there is no "harm" to the Presidency, that if discovery probes too extensively, all the federal officials need do is assert executive privilege or any other privilege that might be available. Maj. op. at 11–12. The unstated premise of the majority's view is that the only potential harm would be in the revelation of privileged material and that the federal officers are fully capable of making sure this does not occur. If this were an adequate answer, department heads and agency officials would regularly be subject to discovery; they too could protect themselves by asserting privileges.

---

determine what the agency actually did." *Marshall County Health Care Auth. v. Shalala*, 988 F. 2d 1221, 1227 (D.C. Cir. 1993).

[4] Even in APA cases, "if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry" – which is precisely what the majority has allowed the district court to do. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

The majority's no-harm proposition is especially ill founded in this case. The Energy Policy Group was part of the Executive Office of the President. If executive privilege is to be asserted, it therefore appears that the President must make the decision. "There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953) (footnotes omitted); *see In re Sealed Case*, 121 F. 3d 729, 744 n.16 (D.C. Cir. 1997). Already the government has voluntarily produced some 36,000 pages of documents in this matter. How many additional documents are potentially subject to discovery we do not know. But it is obvious that decisions to assert privileges must be made document by document and often line by line. With respect to interrogatories and depositions, the decisions about privilege must be made question by question. Each such assertion will trigger yet another round of proceedings in the district court, unless the plaintiffs acquiesce in the President's judgment. In all of this the President will be distracted and diverted from the performance of his constitutional duties and responsibilities. The Supreme Court recognized as much in *Nixon v. Fitzgerald*, 457 U.S. 731, 751 (1982): "Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *See also Clinton v. Jones*, 520 U.S. 681, 694 n.19 (1997) (reiterating that the President generally should not be burdened with suits challenging his official conduct).

If Congress, in order to ensure that outsiders did not have "undue influence," had passed a law requiring all groups within the Executive Office of the President to disclose publicly not only their advice to the President but also all their records, I am confident the law would be struck down as a violation of the separation of powers. My confidence in the unconstitutionality of such a law is not lessened by the prospect that the President might resist some disclosure by invoking executive privilege. *See Public Citizen*, 491 U.S. at 488–89 (Kennedy, J., concurring in the judgment). Discovery

on the basis of allegations of *de facto* membership cannot be distinguished from such a law. Any Presidential committee that consults anyone outside of government, or is suspected to have done so, is potentially subject to discovery into its inner workings. All a plaintiff has to do is bring a mandamus action and allege that private individuals had some ill-defined role in a committee of federal officers advising the President. And according to the majority opinion, the court of appeals is powerless to prevent this.

Although more could be said, I will not dwell further on the constitutional problems raised by today's decision. I believe those problems may be avoided on the basis of a regulation apparently not brought to the court's attention in *AAPS* – a regulation that is contrary to the *de facto* member doctrine. Once that doctrine is cast aside, as it surely must be, *see McCreary v. Offner*, 172 F.3d 76, 81 (D.C. Cir. 1999), it becomes apparent that the district court did not have jurisdiction and that the complaints must be dismissed.[5]

At the time the President formed the Energy Policy Group and during the time plaintiffs allege non-federal personnel attended its meetings, a GSA regulation defined "committee member" to mean "an individual who serves by appointment on a committee and has the full right and obligation to participate in the activities of the committee, including voting on committee recommendations." 41 C.F.R. § 101–6.1003 (2000).[6] As in *AAPS*, the defendants in this case did not

---

[5] Contrary to the implication of the majority, the federal officers have repeatedly argued before the district court and this court that the discovery, as permitted by *AAPS*, violates the separation of powers. *See, e.g.*, Emergency Pet. For Writ of Mandamus at 14–15; *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 46 (D.D.C. 2002). The problem here is not that the defendants failed to make the arguments. The problem is that the majority failed to answer them.

[6] On August 20, 2001, the General Services Administration redefined "committee member" to mean "an individual who serves by appointment or invitation on an advisory committee or subcommittee." *Federal Advisory Committee Management*, 66 Fed. Reg.

mention the regulation in their briefs or at oral argument. Nevertheless we must deal with it, for two reasons.

First, the regulation affects the mandamus jurisdiction of the district court. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). Plaintiffs have not alleged that any of the private individuals they have in mind ever "serve[d] by appointment" to the Energy Policy Group. They have not alleged, in terms of the regulation, that any of these individuals had an "obligation" to serve on the Group or that any of them had the right to vote on matters coming before it.[7] As I wrote in the beginning of this opinion, in mandamus it must appear on the face of the pleadings that the plaintiffs have a "clear" right to relief. *See Power v. Barnhart*, 292 F.3d at 784; *see also Ahmed v. Dep't of Homeland Sec.*, 328 F.3d 383, 386–87 (7th Cir. 2003). In the absence of any allegations satisfying the regulatory definition of "member," plaintiffs had no clear right to relief and the district court therefore did not have jurisdiction.

The other reason is that relying on the regulation rather than the *de facto* member doctrine of *AAPS* avoids the constitutional difficulties this sort of FACA litigation poses, much in the same way the Supreme Court avoided those difficulties in *Public Citizen,* 491 U.S. at 466–67. *See Meredith Corp. v. FCC*, 809 F.2d 863, 872 (D.C. Cir. 1987).[8]

37,728, at 37,734 (July 19, 2001) (codified at 41 C.F.R. § 102–3.25). FACA does not authorize retroactive rulemaking, and there is no indication that this regulation was meant to be retroactive. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

[7] If the regulation controls and if plaintiffs had made these allegations, it would have been a simple matter to determine whether evidence supported the claims. Wide ranging discovery of the sort approved here would be unnecessary and improper. For instance, only the President, and through his directive, the Vice President, had the authority to appoint members to the Group, and even then the authority was limited to full-time government employees.

[8] The majority contends that the court is bound by *AAPS* to permit discovery to determine *de facto* membership. Maj op. at 16–

The validity of GSA's definition of "member" cannot be doubted.  GSA is "the agency responsible for administering FACA."  *Public Citizen*, 491 U.S. at 463 n.12.  It is charged, in § 7(c) with the duty "to prescribe administrative guidelines," which § 8(a) refers to as "directives."  And under § 4(a), regulations GSA promulgates under FACA "shall apply to each advisory committee."  I recognize that the Court in *Public Citizen* gave "diminished deference" to another GSA regulation implementing FACA, without mentioning *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).[9]  But even if GSA's regulation is not entitled to *Chevron* deference, and should receive only whatever deference is due under *Skidmore*,[10] I would apply the regulation to this case in light of the problems of adhering to the *de facto* member doctrine of *AAPS*.  *Cf. University of Great Falls v. NLRB*, 278 F.3d 1335, 1340–41 (D.C. Cir. 2002).  The regulation has the added advantage of enabling the President, at the time of formation of his committee, to determine whether the committee must comply with the many requirements FACA imposes.  The *de facto* membership doctrine, in contrast, will almost invariably require an after-the-fact determination, contemplating as it does an ex-

---

18;  *see also* concurring op. at 4–5.  However, *AAPS* did not consider the GSA regulation, nor did it address the constitutional issues presented by authorizing discovery.  Accordingly, *AAPS*'s holding does not preclude the court from considering these points.  *See Hagans v. Lavine*, 415 U.S. 528, 533 n.5 (1974); *United States v L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37–38 (1952); *see also Legal Services Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J., dissenting).

[9] 491 U.S. at 463 n.12.  The Court gave several reasons, among which were that the regulation was not a "contemporaneous construction" of FACA because it was not promulgated until years after the statute came into effect, and that GSA's regulations did "carry the force of law."  *Id.*  *See generally* Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law:  The Original Convention*, 116 Harv. L. Rev. 467 (2002).

[10] *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

amination of what role a private individual played throughout the committee's life.

In short, I would issue the writ of mandamus and send the case back to the district court with instructions to dismiss the complaints.