No. 03–475. CHENEY, VICE PRESIDENT OF THE UNITED STATES, ET AL. *v.* UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA. C. A. D. C. Cir. [Certiorari granted, 540 U. S. 1088.] Motion to recuse, referred to JUSTICE SCALIA [540 U. S. 1217], and by him denied.

Memorandum of JUSTICE SCALIA.

I have before me a motion to recuse in these cases consolidated below. The motion is filed on behalf of respondent Sierra Club.

The other private respondent, Judicial Watch, Inc., does not join the motion and has publicly stated that it "does not believe the presently-known facts about the hunting trip satisfy the legal standards requiring recusal." Judicial Watch Statement 2 (Feb. 13, 2004) (available in Clerk of Court's case file). (The District Court, a nominal party in this mandamus action, has of course made no appearance.) Since the cases have been consolidated, however, recusal in the one would entail recusal in the other.

## I

The decision whether a judge's impartiality can " 'reasonably be questioned' " is to be made in light of the facts as they existed, and not as they were surmised or reported. See *Microsoft Corp. v. United States,* 530 U. S. 1301, 1302 (2000) (REHNQUIST, C. J., respecting recusal). The facts here were as follows:

For five years or so, I have been going to Louisiana during the Court's long December-January recess, to the duck-hunting camp of a friend whom I met through two hunting companions from Baton Rouge, one a dentist and the other a worker in the field of handicapped rehabilitation. The last three years, I have been accompanied on this trip by a son-in-law who lives near me. Our friend and host, Wallace Carline, has never, as far as I know, had business before this Court. He is not, as some reports have described him, an "energy industry executive" in the sense that summons up boardrooms of ExxonMobil or Con Edison. He runs his own company that provides services and equipment rental to oil rigs in the Gulf of Mexico.

During my December 2002 visit, I learned that Mr. Carline was an admirer of Vice President Cheney. Knowing that the Vice President, with whom I am well acquainted (from our years serving together in the Ford administration), is an enthusiastic duck hunter, I asked whether Mr. Carline would like to invite him to our next year's hunt. The answer was yes; I conveyed the invitation (with my own warm recommendation) in the spring of 2003 and received an acceptance (subject, of course, to any superseding demands on the Vice President's time) in the summer. The Vice President said that if he did go, I would be welcome to fly down to Louisiana with him. (Because of national security requirements, of course, he must fly in a Government plane.) That invitation was later extended—if space was available—to my son-in-law and to a son who was joining the hunt for the first time;

they accepted. The trip was set long before the Court granted certiorari in the present case, and indeed before the petition for certiorari had even been filed.

We departed from Andrews Air Force Base at about 10 a.m. on Monday, January 5, flying in a Gulfstream jet owned by the Government. We landed in Patterson, Louisiana, and went by car to a dock where Mr. Carline met us, to take us on the 20-minute boat trip to his hunting camp. We arrived at about 2 p.m., the 5 of us joining about 8 other hunters, making about 13 hunters in all; also present during our time there were about 3 members of Mr. Carline's staff, and, of course, the Vice President's staff and security detail. It was not an intimate setting. The group hunted that afternoon and Tuesday and Wednesday mornings; it fished (in two boats) Tuesday afternoon. All meals were in common. Sleeping was in rooms of two or three, except for the Vice President, who had his own quarters. Hunting was in two- or three-man blinds. As it turned out, I never hunted in the same blind with the Vice President. Nor was I alone with him at any time during the trip, except, perhaps, for instances so brief and unintentional that I would not recall them—walking to or from a boat, perhaps, or going to or from dinner. Of course we said not a word about the present case. The Vice President left the camp Wednesday afternoon, about two days after our arrival. I stayed on to hunt (with my son and son-in-law) until late Friday morning, when the three of us returned to Washington on a commercial flight from New Orleans.

## II

Let me respond, at the outset, to Sierra Club's suggestion that I should "resolve any doubts in favor of recusal." Motion to Recuse 8. That might be sound advice if I were sitting on a Court of Appeals. But see *In re Aguinda*, 241 F. 3d 194, 201 (CA2 2001). There, my place would be taken by another judge, and the case would proceed normally. On the Supreme Court, however, the consequence is different: The Court proceeds with eight Justices, raising the possibility that, by reason of a tie vote, it will find itself unable to resolve the significant legal issue presented by the case. Thus, as Justices stated in their 1993 Statement of Recusal Policy: "We do not think it would serve the public interest to go beyond the requirements of the statute, and to recuse ourselves, out of an excess of caution, whenever a rela-

tive is a partner in the firm before us or acted as a lawyer at an earlier stage. Even one unnecessary recusal impairs the functioning of the Court." (Available in Clerk of Court's case file.) Moreover, granting the motion is (insofar as the outcome of the particular case is concerned) effectively the same as casting a vote against the petitioner. The petitioner needs five votes to overturn the judgment below, and it makes no difference whether the needed fifth vote is missing because it has been cast for the other side, or because it has not been cast at all.

Even so, recusal is the course I must take—and will take—when, on the basis of established principles and practices, I have said or done something which requires that course. I have recused for such a reason this very Term. See *Elk Grove Unified School Dist.* v. *Newdow,* 540 U. S. 945 (cert. granted, Oct. 14, 2003). I believe, however, that established principles and practices do not require (and thus do not permit) recusal in the present case.

## A

My recusal is required if, by reason of the actions described above, my "impartiality might reasonably be questioned." 28 U. S. C. § 455(a). Why would that result follow from my being in a sizable group of persons, in a hunting camp with the Vice President, where I never hunted with him in the same blind or had other opportunity for private conversation? The only possibility is that it would suggest I am a friend of his. But while friendship is a ground for recusal of a Justice where the personal fortune or the personal freedom of the friend is at issue, it has traditionally *not* been a ground for recusal where *official action* is at issue, no matter how important the official action was to the ambitions or the reputation of the Government officer.

A rule that required Members of this Court to remove themselves from cases in which the official actions of friends were at issue would be utterly disabling. Many Justices have reached this Court precisely because they were friends of the incumbent President or other senior officials—and from the earliest days down to modern times Justices have had close personal relationships with the President and other officers of the Executive. John Quincy Adams hosted dinner parties featuring such luminaries as Chief Justice Marshall, Justices Johnson, Story, and Todd, Attorney General Wirt, and Daniel Webster. 5 Memoirs of John

Quincy Adams 322–323 (C. Adams ed. 1875, reprint 1969) (Diary Entry of Mar. 8, 1821). Justice Harlan and his wife often "'stopped in'" at the White House to see the Hayes family and pass a Sunday evening in a small group, visiting and singing hymns. M. Harlan, Some Memories of a Long Life, 1854–1911, p. 99 (2001). Justice Stone tossed around a medicine ball with members of the Hoover administration mornings outside the White House. 2 Memoirs of Herbert Hoover 327 (1952). Justice Douglas was a regular at President Franklin Roosevelt's poker parties; Chief Justice Vinson played poker with President Truman. J. Simon, Independent Journey: The Life of William O. Douglas 220–221 (1980); D. McCullough, Truman 511 (1992). A no-friends rule would have disqualified much of the Court in *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952), the case that challenged President Truman's seizure of the steel mills. Most of the Justices knew Truman well, and four had been appointed by him. A no-friends rule would surely have required Justice Holmes's recusal in *Northern Securities Co.* v. *United States*, 193 U. S. 197 (1904), the case that challenged President Theodore Roosevelt's trust-busting initiative. See S. Novick, Honorable Justice: The Life of Oliver Wendell Holmes 264 (1989) ("Holmes and Fanny dined at the White House every week or two . . .").

It is said, however, that this case is different because the federal officer (Vice President Cheney) is actually a *named party.* That is by no means a rarity. At the beginning of the current Term, there were before the Court (excluding habeas actions) no fewer than 83 cases in which high-level federal Executive officers were named in their official capacity—more than 1 in every 10 federal civil cases then pending. That an officer is named has traditionally made no difference to the proposition that friendship is not considered to affect impartiality in official-action suits. Regardless of whom they name, such suits, when the officer is the plaintiff, seek relief not for him personally but for the Government; and, when the officer is the defendant, seek relief not against him personally, but against the Government. That is why federal law provides for *automatic substitution* of the new officer when the originally named officer has been replaced. See Fed. Rule Civ. Proc. 25(d)(1); Fed. Rule App. Proc. 43(c)(2); this Court's Rule 35.3. The caption of Sierra Club's complaint in this action designates as a defendant "Vice President Richard Cheney, *in his*

*official capacity* as Vice President of the United States and Chairman of the National Energy Policy Development Group." App. 139 (emphasis added). The body of the complaint repeats (in paragraph 6) that "Defendant Richard Cheney is sued *in his official capacity* as the Vice President of the United States and Chairman of the Cheney Energy Task Force." *Id.*, at 143 (emphasis added). Sierra Club has *relied* upon the fact that this is an official-action rather than a personal suit as a basis for denying the petition. It asserted in its brief in opposition that if there was no Presidential immunity from discovery in *Clinton* v. *Jones*, 520 U. S. 681 (1997), which was a private suit, "[s]urely . . . the Vice President and subordinate White House officials have no greater immunity claim here, especially when the lawsuit relates to their official actions while in office and the primary relief sought is a declaratory judgment." Brief in Opposition 13.

Richard Cheney's name appears in this suit only because he was the head of a Government committee that allegedly did not comply with the Federal Advisory Committee Act (FACA), 5 U. S. C. App. § 2, p. 1, and because he may, by reason of his office, have custody of some or all of the Government documents that the plaintiffs seek. If some other person were to become head of that committee or to obtain custody of those documents, the plaintiffs would name that person and Cheney would be dismissed. Unlike the defendant in *United States* v. *Nixon*, 418 U. S. 683 (1974), or *Clinton* v. *Jones, supra,* Cheney is represented here, not by his personal attorney, but by the United States Department of Justice in the person of the Solicitor General. And the courts at all levels have referred to his arguments as (what they are) the arguments of "the government." See *In re Cheney*, 334 F. 3d 1096, 1100 (CADC 2003); *Judicial Watch, Inc.* v. *National Energy Policy Development Group*, 219 F. Supp. 2d 20, 25 (DC 2002).

The recusal motion, however, asserts the following:

> "Critical to the issue of Justice Scalia's recusal is understanding that this is not a run-of-the-mill legal dispute about an administrative decision. . . . Because his own conduct is central to this case, the Vice President's 'reputation and his integrity are on the line.' (Chicago Tribune.)" Motion to Recuse 9.

I think not. Certainly as far as the legal issues immediately presented to me are concerned, this *is* "a run-of-the-mill legal

dispute about an administrative decision." I am asked to determine what powers the District Court possessed under FACA, and whether the Court of Appeals should have asserted mandamus or appellate jurisdiction over the District Court.[1]  Nothing this Court says on those subjects will have any bearing upon the reputation and integrity of Richard Cheney.  Moreover, even if this Court affirms the decision below and allows discovery to proceed in the District Court, the issue that would ultimately present itself *still* would have no bearing upon the reputation and integrity of Richard Cheney.  That issue would be, quite simply, whether some private individuals were *de facto* members of the National Energy Policy Development Group (NEPDG).  It matters not whether they were caused to be so by Cheney or someone else, or whether Cheney was even aware of their *de facto* status; if they *were de facto* members, then (according to D. C. Circuit law) the records and minutes of NEPDG must be made public.

The recusal motion asserts, however, that Richard Cheney's "'reputation and his integrity are on the line'" because

"respondents have alleged, *inter alia*, that the Vice President, as the head of the Task Force and its sub-groups, was responsible for the involvement of energy industry executives in the operations of the Task Force, as a result of which the Task Force and its sub-groups became subject to FACA." *Ibid.*

As far as Sierra Club's *complaint* is concerned, it simply is not true that Vice President Cheney is singled out as having caused the involvement of energy executives.  But even if the allegation had been made, it would be irrelevant to the case.  FACA assertedly requires disclosure if there were private members of the task

---

[1] The questions presented in the petition, and accepted for review, are as follows:

"1. Whether the Federal Advisory Committee Act (FACA), 5 U. S. C. App. 1, §1 *et seq.*, can be construed . . . to authorize broad discovery of the process by which the Vice President and other senior advisors gathered information to advise the President on important national policy matters, based solely on an unsupported allegation in a complaint that the advisory group was not constituted as the President expressly directed and the advisory group itself reported.

"2. Whether the court of appeals had mandamus or appellate jurisdiction to review the district court's unprecedented discovery orders in this litigation."  Pet. for Cert. (I).

force, *no matter who* they were—"energy industry executives" or Ralph Nader; and *no matter who* was responsible for their membership—the Vice President or no one in particular. I do not see how the Vice President's "'reputation and . . . integrity are on the line'" any more than the agency head's reputation and integrity are on the line in virtually all official-action suits, which accuse his agency of acting (to quote the Administrative Procedure Act) "arbitrar[ily], capricious[ly], [with] an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Beyond that always-present accusation, there is nothing illegal or immoral about making "energy industry executives" members of a task force on energy; some people probably think it would be a good idea. If, in doing so, or in allowing it to happen, the Vice President went beyond his assigned powers, that is no worse than what every agency head has done when his action is judicially set aside.

To be sure, there could be political consequences from disclosure of the fact (if it be so) that the Vice President favored business interests, and especially a sector of business with which he was formerly connected. But political consequences are not my concern, and the possibility of them does not convert an official suit into a private one. That possibility exists to a greater or lesser degree in virtually all suits involving agency action. To expect judges to take account of political consequences—and to assess the high or low degree of them—is to ask judges to do precisely what they should not do. It seems to me quite wrong (and quite impossible) to make recusal depend upon what degree of political damage a particular case 'can be expected to inflict.

In sum, I see nothing about this case which takes it out of the category of normal official-action litigation, where my friendship, or the appearance of my friendship, with one of the named officers does not require recusal.

B

The recusal motion claims that "the fact that Justice Scalia and his daughter *[sic]* were the Vice President's guest on Air Force Two on the flight down to Louisiana" means that I "accepted a sizable gift from a party in a pending case," a gift "measured in the thousands of dollars." Motion to Recuse 6 (footnote omitted).

Let me speak first to the value, though that is not the principal point. Our flight down cost the Government nothing, since

space-available was the condition of our invitation. And, though our flight down on the Vice President's plane was indeed free, since we were not returning with him we purchased (because they were least expensive) round-trip tickets that cost precisely what we would have paid if we had gone both down and back on commercial flights. In other words, none of us saved a cent by flying on the Vice President's plane. The purpose of going with him was not saving money, but avoiding some inconvenience to ourselves (being taken by car from New Orleans to Morgan City) and considerable inconvenience to our friends, who would have had to meet our plane in New Orleans, and schedule separate boat trips to the hunting camp, for us and for the Vice President's party. (To be sure, flying on the Vice President's jet was more comfortable and more convenient than flying commercially; that accommodation is a matter I address in the next paragraph.)[2]

The principal point, however, is that social courtesies, provided at Government expense by officials whose only business before the Court is business in their official capacity, have not hitherto been thought prohibited. Members of Congress and others are frequently invited to accompany Executive Branch officials on Government planes, where space is available. That this is not the sort of gift thought likely to affect a judge's impartiality is suggested by the fact that the Ethics in Government Act of 1978, 5 U. S. C. App. § 101 *et seq.*, p. 38, which requires annual reporting of transportation provided or reimbursed, excludes from this requirement transportation provided by the United States. See § 109(5)(C); Committee on Financial Disclosure, Administrative Office of the U. S. Courts, Financial Disclosure Report: Filing Instructions for Judicial Officers and Employees 25 (Jan. 2003). I daresay that, at a hypothetical charity auction, much more would be bid for dinner for two at the White House than for a one-way flight to Louisiana on the Vice President's jet. Justices accept the former with regularity. While this matter was pending, Justices and their spouses were invited (*all* of them, I believe)

---

[2] As my statement of the facts indicated, by the way, my daughter did not accompany me. My married son and son-in-law were given a ride—not because they were relatives and as a favor to me; but because they were other hunters leaving from Washington, and as a favor to them (and to those who would have had to go to New Orleans to meet them). Had they been unrelated invitees to the hunt, the same would undoubtedly have occurred. Financially, the flight was worth as little to them as it was to me.

to a December 11, 2003, Christmas reception at the residence of
the Vice President—which included an opportunity for a photo-
graph with the Vice President and Mrs. Cheney. Several of the
Justices attended, and in doing so they were fully in accord with
the proprieties.

### III

When I learned that Sierra Club had filed a recusal motion in
this case, I assumed that the motion would be replete with cita-
tions of legal authority, and would provide some instances of cases
in which, because of activity similar to what occurred here, Jus-
tices have recused themselves or at least have been asked to do
so. In fact, however, the motion cites only two Supreme Court
cases assertedly relevant to the issue here discussed,[3] and nine
Court of Appeals cases. Not a single one of these even involves
an official-action suit.[4] And the motion gives not a single in-
stance in which, under even remotely similar circumstances, a
Justice has recused or been asked to recuse. Instead, the argu-
ment section of the motion consists almost entirely of references
to, and quotations from, newspaper editorials.

The core of Sierra Club's argument is as follows:

---

[3] The motion cites a third Supreme Court case, *Public Citizen* v. *Depart-
ment of Justice,* 491 U. S. 440 (1989), as a case involving FACA in which I
recused myself. It speculates (1) that the reason for recusal was that as
Assistant Attorney General for the Office of Legal Counsel I had provided
an opinion which concluded that applying FACA to presidential advisory
committees was unconstitutional; and asserts (2) that this would also be
grounds for my recusal here. My opinion as Assistant Attorney General
addressed the precise question presented in *Public Citizen:* whether the
American Bar Association's Standing Committee on Federal Judiciary, which
provided advice to the President concerning judicial nominees, could be reg-
ulated as an "advisory committee" under FACA. I concluded that my with-
drawal from the case was required by 28 U. S. C. § 455(b)(3), which mandates
recusal where the judge "has served in governmental employment and in
such capacity . . . expressed an opinion concerning the merits of the particu-
lar case in controversy." I have never expressed an opinion concerning the
merits of the present case.

[4] *United States* v. *Murphy,* 768 F. 2d 1518 (CA7 1985), at least involved a
judge's going on vacation—but not with the named defendant in an official-
action suit. The judge had departed for a vacation with the prosecutor of
Murphy's case, immediately after sentencing Murphy. Obviously, the prose-
cutor is personally involved in the outcome of the case in a way that the
nominal defendant in an official-action suit is not.

"Sierra Club makes this motion because . . . damage [to the integrity of the system] is being done right now. As of today, 8 of the 10 newspapers with the largest circulation in the United States, 14 of the largest 20, and 20 of the 30 largest have called on Justice Scalia to step aside . . . . . Of equal import, there is no counterbalance or controversy: not a single newspaper has argued against recusal. Because the American public, as reflected in the nation's newspaper editorials, has unanimously concluded that there is an appearance of favoritism, any objective observer would be compelled to conclude that Justice Scalia's impartiality has been questioned. These facts more than satisfy Section 455(a), which mandates recusal merely when a Justice's impartiality 'might reasonably be questioned.'" Motion to Recuse 3–4.

The implications of this argument are staggering. I must recuse because a significant portion of the press, which is deemed to be the American public, demands it.

The motion attaches as exhibits the press editorials on which it relies. Many of them do not even have the facts right. The length of our hunting trip together was said to be several days (San Francisco Chronicle), four days (Boston Globe), or nine days (San Antonio Express-News). We spent about 48 hours together at the hunting camp. It was asserted that the Vice President and I "spent time alone in the rushes," "huddled together in a Louisiana marsh," where we had "plenty of time . . . to talk privately" (Los Angeles Times); that we "spent . . . quality time bonding [together] in a duck blind" (Atlanta Journal-Constitution); and that "[t]here is simply no reason to think these two did not discuss the pending case" (Buffalo News). As I have described, the Vice President and I were never in the same blind, and never discussed the case. (Washington officials know the rules, and know that discussing with judges pending cases—their own or anyone else's—is forbidden.) The Palm Beach Post stated that our "transportation [was] provided, appropriately, by an oil services company," and Newsday that a "private jet . . . whisked Scalia to Louisiana." The Vice President and I flew in a Government plane. The Cincinnati Enquirer said that "Scalia was Cheney's guest at a private duck-hunting camp in Louisiana." Cheney and I were Wallace Carline's guests. Various newspapers described Mr. Carline as "an energy company official" (Atlanta

Journal-Constitution), an "oil industrialist" (Cincinnati Enquirer), an "oil company executive" (Contra Costa Times), an "oilman" (Minneapolis Star Tribune), and an "energy industry executive" (Washington Post). All of these descriptions are misleading.

And these are just the inaccuracies pertaining to the *facts*. With regard to the *law*, the vast majority of the editorials display no recognition of the central proposition that a federal officer is not ordinarily regarded to be a personal party in interest in an official-action suit. And those that do display such recognition facilely assume, contrary to all precedent, that in such suits mere political damage (which they characterize as a destruction of Cheney's reputation and integrity) is ground for recusal. Such a blast of largely inaccurate and uninformed opinion cannot determine the recusal question. It is well established that the recusal inquiry must be "made from the perspective of a *reasonable* observer who is *informed of all the surrounding facts and circumstances.*" *Microsoft Corp.* v. *United States*, 530 U. S., at 1302 (REHNQUIST, C. J., respecting recusal) (emphases added) (citing *Liteky* v. *United States*, 510 U. S. 540, 548 (1994)).

## IV

While Sierra Club was apparently unable to summon forth a single example of a Justice's recusal (or even motion for a Justice's recusal) under circumstances similar to those here, I have been able to accomplish the seemingly more difficult task of finding a couple of examples establishing the negative: that recusal or motion for recusal did *not* occur under circumstances similar to those here.

### Justice White and Robert Kennedy

The first example pertains to a Justice with whom I have sat, and who retired from the Court only 11 years ago, Byron R. White. Justice White was close friends with Attorney General Robert Kennedy from the days when White had served as Kennedy's Deputy Attorney General. In January 1963, the Justice went on a skiing vacation in Colorado with Robert Kennedy and his family, Secretary of Defense Robert McNamara and his family, and other members of the Kennedy family. Skiing Not The Best; McNamara Leaves Colorado, Terms Vacation "Marvelous," Denver Post, Jan. 2, 1963, p. 22; D. Hutchinson, The Man Who Once Was Whizzer White 342 (1998). (The skiing in Colorado, like my

hunting in Louisiana, was not particularly successful.) At the time of this skiing vacation there were pending before the Court at least two cases in which Robert Kennedy, in his official capacity as Attorney General, was a party. See *Gastelum-Quinones* v. *Kennedy*, 374 U. S. 469 (1963); *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144 (1963). In the first of these, moreover, the press might have said, as plausibly as it has said here, that the reputation and integrity of the Attorney General were at issue. There the Department of Justice had decreed deportation of a resident alien on grounds that he had been a member of the Communist Party. (The Court found that the evidence adduced by the Department was inadequate.)

Besides these cases naming Kennedy, another case pending at the time of the skiing vacation was argued to the Court *by Kennedy* about two weeks later. See *Gray* v. *Sanders*, 372 U. S. 368 (1963). That case was important to the Kennedy administration, because by the time of its argument everybody knew that the apportionment cases were not far behind, and *Gray* was a significant step in the march toward *Reynolds* v. *Sims*, 377 U. S. 533 (1964). When the decision was announced, it was front-page news. See High Court Voids County Unit Vote, N. Y. Times, Mar. 19, 1963, p. 1, col. 2; Georgia's Unit Voting Voided, Washington Post, Mar. 19, 1963, p. A1, col. 5. Attorney General Kennedy argued for affirmance of a three-judge District Court's ruling that the Georgia Democratic Party's county-unit voting system violated the one-person, one-vote principle. This was Kennedy's only argument before the Court, and it certainly put "on the line" his reputation as a lawyer, as well as an important policy of his brother's administration.

### Justice Jackson and Franklin Roosevelt

The second example pertains to a Justice who was one of the most distinguished occupants of the seat to which I was appointed, Robert Jackson. Justice Jackson took the recusal obligation particularly seriously. See, *e. g.*, *Jewell Ridge Coal Corp.* v. *United Mine Workers*, 325 U. S. 897 (1945) (Jackson, J., concurring in denial of rehearing) (oblique criticism of Justice Black's decision not to recuse himself from a case argued by his former law partner). Nonetheless, he saw nothing wrong with maintaining a close personal relationship, and engaging in "'quite frequen[t]'" socializing with the President whose administration's acts came

before him regularly. R. Jackson, That Man: An Insider's Portrait of Franklin D. Roosevelt 74 (J. Barrett ed. 2003) (footnote omitted).

In April 1942, the two "spent a weekend on a very delightful house party down at General Watson's in Charlottesville, Virginia. I had been invited to ride down with the President and to ride back with him." *Id.*, at 106 (footnote omitted). Pending at the time, and argued the next month, was one of the most important cases concerning the scope of permissible federal action under the Commerce Clause, *Wickard* v. *Filburn*, 317 U. S. 111 (1942). Justice Jackson wrote the opinion for the Court. Roosevelt's Secretary of Agriculture, rather than Roosevelt himself, was the named federal officer in the case, but there is no doubt that it was important to the President.

I see nothing wrong about Justice White's and Justice Jackson's socializing—including vacationing and accepting rides—with their friends. Nor, seemingly, did anyone else at the time. (The Denver Post, which has been critical of me, reported the White-Kennedy-McNamara skiing vacation with nothing but enthusiasm.) If friendship is basis for recusal (as it assuredly is when friends are sued personally) then activity which suggests close friendship must be avoided. But if friendship is *no* basis for recusal (as it is not in official-capacity suits) social contacts that do no more than evidence that friendship suggest no impropriety whatever.

Of course it can be claimed (as some editorials have claimed) that "times have changed," and what was once considered proper—even as recently as Byron White's day—is no longer so. That may be true with regard to the earlier rare phenomenon of a Supreme Court Justice's serving as advisor and confidant to the President—though that activity, so incompatible with the separation of powers, was not widely known when it was occurring, and can hardly be said to have been generally approved before it was properly abandoned. But the well-known and constant practice of Justices' enjoying friendship and social intercourse with Members of Congress and officers of the Executive Branch has *not* been abandoned, and ought not to be.

## V

Since I do not believe my impartiality can reasonably be questioned, I do not think it would be proper for me to recuse. See

*Microsoft*, 530 U. S., at 1302. That alone is conclusive; but another consideration moves me in the same direction: Recusal would in my judgment harm the Court. If I were to withdraw from this case, it would be because some of the press has argued that the Vice President would suffer political damage *if* he should lose this appeal, and *if*, on remand, discovery should establish that energy industry representatives were *de facto* members of NEPDG—and because some of the press has elevated that possible political damage to the status of an impending stain on the reputation and integrity of the Vice President. But since political damage often comes from the Government's losing official-action suits; and since political damage can readily be characterized as a stain on reputation and integrity; recusing in the face of such charges would give elements of the press a veto over participation of any Justices who had social contacts with, or were even known to be friends of, a named official. That is intolerable.

My recusal would also encourage so-called investigative journalists to suggest improprieties, and demand recusals, for other inappropriate (and increasingly silly) reasons. The Los Angeles Times has already suggested that it was improper for me to sit on a case argued by a law school dean whose school I had visited several weeks before—visited not at his invitation, but at his predecessor's. See New Trip Trouble for Scalia, Feb. 28, 2004, p. B22. The same paper has asserted that it was improper for me to speak at a dinner honoring Cardinal Bevilacqua given by the Urban Family Council of Philadelphia because (according to the Times's false report)[5] that organization was engaged in litiga-

---

[5] The Times's reporter had interviewed the former president of the Urban Family Council, who told him categorically that the council was neither a party to, nor had provided financial support for, the civil-union litigation. The filed papers in the case, publicly available, *showed* that the council was not a party. The Los Angeles Times nonetheless devoted a lengthy front-page article to the point that (in the words of the lead sentence) "Justice Antonin Scalia gave a keynote dinner speech in Philadelphia for an advocacy group waging a legal battle against gay rights." Serrano & Savage, Scalia Addressed Advocacy Group Before Key Decision, Mar. 8, 2004, at A1. Five days later, in a weekend edition, the paper printed (at the insistence of the council) a few-line retraction acknowledging that this asserted fact was wrong—as though it was merely one incidental fact in a long piece, rather than the central fact upon which the long piece was based, and without which *there was no story.* See For the Record, Mar. 13, 2004, at A2. Other inaccurate facts and insinuations in the article, brought to the paper's atten-

tion seeking to prevent same-sex civil unions, and I had before me a case presenting the question (whether same-sex civil unions were lawful?—no) whether homosexual sodomy could constitutionally be *criminalized.* See *Lawrence* v. *Texas,* 539 U. S. 558 (2003). While the political branches can perhaps survive the constant baseless allegations of impropriety that have become the staple of Washington reportage, this Court cannot. The people must have confidence in the integrity of the Justices, and that cannot exist in a system that assumes them to be corruptible by the slightest friendship or favor, and in an atmosphere where the press will be eager to find foot-faults.

\* \* \*

As I noted at the outset, one of the private respondents in this case has not called for my recusal, and has expressed confidence that I will rule impartially, as indeed I will. Counsel for the other private respondent seek to impose, it seems to me, a standard regarding friendship, the appearance of friendship, and the acceptance of social favors, that is more stringent than what they themselves observe. Two days before the brief in opposition to the petition in this case was filed, lead counsel for Sierra Club, a friend, wrote me a warm note inviting me to come to Stanford Law School to speak to one of his classes. (Available in Clerk of Court's case file.) (Judges teaching classes at law schools normally have their transportation and expenses paid.) I saw nothing amiss in that friendly letter and invitation. I surely would have thought otherwise if I had applied the standards urged in the present motion.

There are, I am sure, those who believe that my friendship with persons in the current administration might cause me to favor the Government in cases brought against it. That is not the issue here. Nor is the issue whether personal friendship with the Vice President might cause me to favor the Government in cases in which *he* is named. None of those suspicions regarding my impartiality (erroneous suspicions, I hasten to protest) bears upon recusal here. The question, simply put, is whether someone who thought I could decide this case impartially despite my

tion by the council, were not corrected. See e-mail from Betty Jean Wolfe, President, Urban Family Council, to Richard Serrano, Los Angeles Times (Mar. 8, 2004) (available in Clerk of Court's case file).

friendship with the Vice President would reasonably believe that I *cannot* decide it impartially because I went hunting with that friend and accepted an invitation to fly there with him on a Government plane. If it is reasonable to think that a Supreme Court Justice can be bought so cheap, the Nation is in deeper trouble than I had imagined.

As the newspaper editorials appended to the motion make clear, I have received a good deal of embarrassing criticism and adverse publicity in connection with the matters at issue here—even to the point of becoming (as the motion cruelly but accurately states) "fodder for late-night comedians." Motion to Recuse 6. If I could have done so in good conscience, I would have been pleased to demonstrate my integrity, and immediately silence the criticism, by getting off the case. Since I believe there is no basis for recusal, I cannot. The motion is

*Denied.*