912 A.2d 755

COMMONWEALTH of Pennsylvania, Appellee,

v.

Michael RAINEY, Appellant.

Supreme Court of Pennsylvania.

July 7, 2006.

Justice CASTILLE.

## ORDER

**AND NOW**, this 7th day of July, 2006, upon review of Appellant's Motion for Recusal and the Commonwealth's Reply in opposition to the Motion, the Motion for Recusal is DENIED.

## OPINION IN SUPPORT OF DENIAL OF APPELLANT'S MOTION FOR RECUSAL

Appellant Michael Rainey, through his counsel, Attorney Billy H. Nolas, Esquire, of the Defender Association of Philadelphia, Capital Habeas Unit, has filed a motion for my recusal in this capital matter, which is an appeal from the denial of appellant's petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* For the reasons set forth below, I will deny the Motion.

258

On December 27, 1991, a Philadelphia County jury convicted appellant of first-degree murder and related charges arising from the December 7, 1989, robbery and murder of seventy-four year-old Carroll Fleming. The jury sentenced appellant to death. This Court affirmed the judgment of sentence in a unanimous opinion by Justice Frank J. Montemuro, filed on March 24, 1995. *Commonwealth v. Rainey*, 540 Pa. 220, 656 A.2d 1326 (1995), *cert. denied*, 516 U.S. 1008, 116 S.Ct. 562, 133 L.Ed.2d 488 (1995). I participated in that decision with no objection from appellant.

Appellant thereafter filed a *pro se* petition for PCRA relief, counsel was appointed, and amended petitions were filed. The PCRA court dismissed appellant's petition on August 8, 1997 and appellant appealed. On December 28, 2001, this Court remanded the case to the PCRA court to prepare an opinion consistent with *Commonwealth v. Williams*, 566 Pa. 553, 782 A.2d 517 (2001). *Commonwealth v. Rainey*, 567 Pa. 271, 786 A.2d 942 (2001). I participated in that decision and authored a concurring statement. Again, I was not asked to recuse. On July 26, 2004, the PCRA court filed an opinion dismissing appellant's PCRA petition without a hearing and addressing his claims. Appellant again appealed. On February 22, 2006, the Brief for Appellant was filed along with the instant motion requesting my recusal. The Commonwealth filed its brief as appellee, as well as a reply in opposition to the recusal request.

Mr. Nolas alleges the following "factual" predicates as grounds in support of recusal: 1) I was the elected District Attorney of Philadelphia County at the time appellant committed his offense, when the Commonwealth conducted its pre-trial investigation of the case, and when it decided to charge appellant; 2) I "decided to seek the death penalty for this teenaged defendant;" 3) I "decided to try appellant jointly with [his] codefendant;" 4) I "authorized the creation of a jury selection training videotape in which racially discriminatory jury selection methods are taught" (the "McMahon tape"); and 5) I "authorized a lecture by [the Office] Director of Training [ADA Bruce Sagel] in which similar racially discrimi-

natory practices were taught." Mr. Nolas alleges that "all of these matters are subjects of the instant appeal." Based on these averments, Mr. Nolas argues that I "served as a lawyer" in the case and thus my recusal is "required" under Canon 3 of the Code of Judicial Conduct. Mr. Nolas also suggests that my impartiality might reasonably be questioned based upon his first three allegations. He separately alleges that my impartiality might reasonably be questioned based on his fourth and fifth factual allegations.

The Commonwealth responds by arguing, first, that Canon 3 creates no "right" in a party to have a judge or justice recused, but merely provides standards by which judges should exercise their discretion in ruling upon recusal requests. The Commonwealth further notes that, in *Commonwealth v. Jones,* 663 A.2d 142 (1995) (Recusal Opinion of Castille, J.), I thoroughly addressed recusal claims premised upon my official role as the publicly-elected District Attorney during some portion of a defendant's prosecution. The Commonwealth argues that my involvement as a prosecutor in appellant's case was no greater than in any other case where the Commonwealth sought the death penalty during my tenure. With specific respect to the role of the elected District Attorney in the decision to seek the death penalty, the Commonwealth describes the office policy respecting such decisions as follows:

[T]he decision to seek the death penalty is initially approved by the Chief of the Homicide Unit, after reviewing a memorandum prepared by the trial prosecutor. The recommendation to seek the death penalty is then referred to the Deputy District Attorney for the Trial Division and subsequently to the First Assistant District Attorney. If both the Trial Deputy and First Assistant concur in the recommendation, it is submitted to the District Attorney for final authorization. The District Attorney's authorization constitutes a concurrence in the judgments of the First Assistant, Trial Deputy and the Chief of the Homicide Unit that the trial prosecutor has demonstrated a statutory basis for seeking the death penalty.

260

The Commonwealth concludes this point by noting that, aside from concurring in the judgment of my assistants concerning the facial applicability of the death penalty statute, and serving in a formal role (such that my name appeared upon pleadings, *etc.*), there is no showing, or claim, that I actually directed, oversaw, or participated in the prosecution of this matter, a matter which went to trial long after I left the District Attorney's Office.

■ To the extent the recusal request is premised upon my role as District Attorney when certain pre-trial prosecutorial decisions were made, my opinion in *Jones*, which Mr. Nolas neglects to cite, controls. As I noted there, because of my position as District Attorney, my signature was affixed onto every indictment and complaint as an administrative formality. I believe my name was also listed on many, if not all, motions filed by my assistants, again as an administrative formality. I was not personally involved in every charging decision made by my assistants, nor did I actively participate in routine decisions involving, *inter alia*, whether to seek a joint trial for co-conspirators. To the best of my knowledge and recollection, I was not personally involved in any pre-trial investigation of appellant, the charging decisions that were made in his case, or the decision to seek to try him jointly with his codefendant. I have no special knowledge of any facts regarding whatever pre-trial proceedings occurred during my tenure as District Attorney; indeed, my only familiarity with this case is that which I have gleaned from the pleadings filed with this Court and the opinions published in appellant's prior appeals. Moreover, Mr. Nolas has pointed to nothing in the record that demonstrates otherwise. Thus, for example, Mr. Nolas's assertion, as if it were a historical fact, that I "decided to try [a]ppellant jointly with [the] codefendant," an assertion unsupported by any citation to the record, is simply false. In short, the first and third factual assertions made by Mr. Nolas, which at best relate to my formal role as the elected District Attorney, establish no basis for recusal. I have no doubt as to my "ability to preside impartially." *Commonwealth v. Goodman*, 454 Pa. 358, 311 A.2d 652, 654 (1973)

(quoting from A.B.A. Standards Relating to the Function of the Trial Judge § 1.7); *see also Commonwealth v. Darush*, 501 Pa. 15, 459 A.2d 727, 731 (1983).

Mr. Nolas's claim that recusal is required because I "decided to seek the death penalty for this teenaged defendant" likewise establishes no basis for recusal. Although Mr. Nolas is vague and his argument peremptory, the "decision" he presumably refers to is the written "Notice of Aggravating Circumstances" that this Court's Rules of Criminal Procedure require the Commonwealth's attorney to file and serve upon the defendant very early in a capital prosecution, *i.e.*, at or before the time of arraignment. *See* Pa.R.Crim.P. 802 (formerly Rule 352).[1] The purpose of this notice Rule is to give the defendant sufficient time and information to prepare for the penalty hearing, should there be one. *See id.* Comment; *see also Commonwealth v. Wesley*, 562 Pa. 7, 753 A.2d 204, 212 (2000). The Commonwealth's account of office policy respecting such preliminary decisions to seek the death penalty is an accurate description of the manner in which such decisions were made during my tenure. My formal approval of such recommendations from my assistants, recommendations approved at all levels in the chain of command, simply represented a concurrence in their judgment that the death penalty statute applied, *i.e.*, that one or more of the statutory aggravating circumstances set forth in the Sentencing Code, *see* 42 Pa.C.S. § 9711(d), existed, and nothing more.

My concurrence in the judgment of my assistants that notice should be provided to a murder defendant of potential aggravating circumstances is not, in my considered view, a level of involvement in the matter in controversy which recommends or warrants recusal. The Commonwealth's notice is subject to challenge in appropriate cases, with the trial court authorized to "rule that the case shall proceed non-capital."

1. Before the notice requirement was adopted by this Court, the "accused was deemed to be on notice that the Commonwealth would attempt to establish one or more of the aggravating circumstances set forth in the death penalty statute." *See Commonwealth v. Buck*, 551 Pa. 184, 709 A.2d 892, 895 n. 1 (1998).

*Commonwealth v. Buck,* 551 Pa. 184, 709 A.2d 892, 896–97 (1998). Moreover, even if the case continues on a capital track and the defendant is convicted of first-degree murder, it is the trial judge who will ultimately determine whether sufficient evidence exists to submit the aggravator to the factfinder, and it is then the factfinder who must ultimately determine (by unanimous vote, if a jury) if the aggravator has been proven beyond a reasonable doubt.

In this case, Mr. Nolas does not allege that the single aggravating circumstance—*i.e.,* that appellant murdered the victim during the perpetration of a felony—was unsupported by any evidence, such that the Commonwealth's discharge of its notice obligation, which I supposedly approved, was incorrect. Moreover, appellant did not challenge the notice pretrial—thus, the propriety and adequacy of the notice was never an issue in controversy. Nor is there any issue raised on this collateral appeal concerning the notice. In addition, even if some such challenge were belatedly forwarded now, the fact would remain that a jury of appellant's peers unanimously found the aggravating circumstance beyond a reasonable doubt following a trial which was conducted after I left the District Attorney's Office, and this Court determined on direct appeal that the jury's finding "was clearly supported by the evidence." *Rainey,* 656 A.2d at 1335. In such circumstances, there is nothing of substance arising from the mere filing of the Notice of Aggravating Circumstances which suggests that I cannot be fair and impartial in the instant collateral appeal.[2]

Also, in this regard, I reiterate what I noted in *Jones* respecting the special considerations implicated when a Judge or Justice on a jurisdiction's highest court is asked to recuse

"[T]here is no way of substituting Justices on [the highest] Court as one judge may be substituted for another in the [lower] courts. There is no higher court of appeal that may

2. Mr. Nolas's reference to appellant being a teenager at the time he murdered the victim is inexplicable, since nothing in the death penalty statute exempts of-age teenagers from the reach of the ultimate penalty.

review an equally divided decision of this Court and thereby establish the law for our jurisdiction."

663 A.2d at 145 (*quoting Laird v. Tatum*, 409 U.S. 824, 837, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (recusal opinion of Rehnquist, J.)). *See also Cheney v. United States District Court for the District of Columbia*, 541 U.S. 913, 916, 124 S.Ct. 1391, 158 L.Ed.2d 225 (2004) (recusal opinion of Scalia, J.) ("Even one unnecessary recusal impairs the functioning of the Court") (*citing* Court's 1993 Statement of Recusal Policy). As Justice Scalia emphasized in the *Cheney* case, it is also notable that, where a Justice of the highest court is involved, and the party requesting recusal is the appellant, the effect of granting the motion is "effectively the same as casting a vote against [appellant.]" *Cheney* (recusal opinion of Scalia, J.). Thus, in the case *sub judice*, because the Commonwealth prevailed below, to secure appellate relief appellant needs four votes "and it makes no difference whether the needed [fourth] vote is missing because it has been cast for the other side, or because it has not been cast at all." *Id.*

▮ Mr. Nolas's final two "factual" allegations assert that I(1) "authorized the creation of a jury selection training video-tape in which racially discriminatory jury selection methods are taught;" and (2) "authorized a lecture by [my] Director of Training in which similar racially discriminatory practices were taught." Mr. Nolas then argues that my impartiality might reasonably be questioned on this appeal because one of appellant's PCRA appeal claims concerns "racially discrimina-tory jury selection trainings that were conducted under [my] watch as District Attorney."

The accusation that I authorized racially discriminatory jury selection practices is a serious one, and one would expect that the Defender Association, and the member of the bar of this Court who wrote the Motion, would forward such an accusa-tion only in good faith and only if supported by a solid factual predicate. In this case, however, the Association and Mr. Nolas cite nothing in the record below to support the claim that I personally authorized the tape and lecture upon which they premise their motion. Instead, as support for these

"factual" averments, Mr. Nolas cites only to the McMahon tape and to what he calls, "notes from jury selection training lecture." He does not indicate where in the record these materials may be found, nor does he append them to his Motion. Upon reviewing the appellate briefs, it appears that appellant did not raise the underlying substantive claim in his PCRA petition, there was no hearing on the claim below, and the PCRA court never passed upon it. It is safe to assume, then, that there is no record support for what Mr. Nolas blindly poses as if it were "fact."

Notwithstanding that the materials adverted to in the Motion apparently are *dehors* the record, in the Appendix to his Brief Mr. Nolas appends a transcript of the McMahon tape and three pages of handwritten notes which he calls "Handwritten notes from jury selection training lecture." Mr. Nolas does not indicate where in these materials there is a scintilla of support for the notion that I personally "authorized" what he accuses me of authorizing, and my review of the materials reveals no such support. In addition, I note that in his appellate Brief, Mr. Nolas takes his reckless disregard one step further and declares rather scurrilously that his non-record materials prove "the deliberate policy of [the District Attorney's] Office to strike jurors based on race and to make certain that new prosecutors entering the office would be properly coached in the manner and method of excluding such jurors while evading the check of the Constitution." Brief for Appellant, 40.

Mr. Nolas's unsupported "factual" averments are utterly false, and thus there is no predicate whatsoever for this particular recusal argument. In point of fact, as the duly-elected District Attorney of Philadelphia County I never "authorized" or encouraged any of my assistants to teach racially discriminatory jury selection methods in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Indeed, I neither authorized nor encouraged my assistants to violate any governing statute, case, or rule, including those same ethical rules which bind Mr. Nolas. I took an Oath of Office as District Attorney which, like the oath I no less

proudly swore upon being admitted to the bar of this Court, represented my promise to support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth, and to discharge my duties with fidelity.[3] The notion of pledging to discharge one's constitutional duties with fidelity is not an abstraction for me.

Leaving aside the content, purpose, and significance of the two "training lectures" cited by Mr. Nolas—specifics that the Commonwealth contests—I do not recall having any specific foreknowledge of the lecture by ADA McMahon or the lecture by ADA Sagel, much less did I review or authorize their specific content. That my name appeared on the cover of the McMahon videotape was a simple function of the fact that it was a tape produced within the Office during my tenure as the elected District Attorney. The notion that everything produced in the Office was personally reviewed, much less approved, by me, and represented established office "policy," is patently absurd.

The District Attorney's Office during my tenure consisted of approximately 225 attorneys, handling an average yearly caseload of 30,000 summary and misdemeanor cases, 15,000 felony cases, 10,000 juvenile cases, and thousands of appeals. In an office of such size, by necessity, the responsibility for training and informational lectures is delegated to assistants. I did not—indeed, given the size of the Office and the scope of my responsibilities, I could not—micromanage what every assistant district attorney said. It was physically impossible for me to review and pre-approve what more senior prosecutors might say to newer ones, whether in a formal or informal setting. When prosecutors come to the bar of this Court, like all defenders, they take an oath to uphold and defend the

3. It bears noting, given the nature of the instant allegations, that the attorney's oath of office includes a pledge to "use no falsehood." 42 Pa.C.S. § 2522. In addition, the Rules of Professional Conduct prohibit lawyers from knowingly making a false statement of material fact or law to a tribunal. R.P.C. 3.3(a)(1). *See also* R.P.C. 8.2(a) (prohibiting statements that the lawyer knows to be false or with reckless disregard as to their truth or falsity concerning the qualifications or integrity of a judge or public legal officer); R.P.C. 8.4(c) (prohibiting conduct involving dishonesty, fraud, deceit or misrepresentation).

Constitution. In addition, prosecutors take an oath of office. As the Philadelphia Defender well knows, assistant district attorneys in Philadelphia County, like their counterparts in the Defender's Office, of necessity are delegated a great deal of individual responsibility. Any head of any such large legal organization must necessarily be able to trust in the power of the oath and the professionalism of the lawyers under his or her command to abide by their obligation of constitutional fidelity.[4] It bears repeating: lawyers are professionals. The fact that one attorney interprets a new case in one way does not mean that another attorney, learned in the law, agrees with that interpretation and will act upon it. And it certainly does not mean that what one subordinate attorney says is etched in stone as if it were gospel from the mouth of the public official in charge of that Office. I certainly hope that the Chief Defender did not personally review and approve as a "policy" matter the falsehoods that are the basis for Mr. Nolas's argument contained herein.

In short, it was never a policy of the District Attorney's Office during my watch to violate *Batson*, to engage in discriminatory practices of any kind, or to violate any other governing precept of law. Mr. Nolas's allegations are as bereft of factual support as they are distressingly unmindful of his own sworn duties as a lawyer and officer of this Court. *See* R.P.C. 3.3(a)(1), RPC 8.2(a), RPC 8.4(c).

Finally, on the question of the proper inference to draw from the non-record sources Mr. Nolas cites, and given the reckless nature of Mr. Nolas's baseless allegation that I instilled a "policy" of discrimination, it is worth noting that a similar "policy" claim was recently raised, and rejected, in federal district court. In *Bond v. Beard*, 2006 WL 1117862, at 3–4 (E.D.Pa. April 24, 2006) (unpublished decision), the learned Senior Judge John P. Fullam reasoned as follows:

---

4. Tellingly, Mr. Nolas is the only member of the Defender Association whose name is listed on the Motion and appellant's brief, even though his ultimate supervisor is Ellen T. Greenlee, Esquire, the Chief Public Defender.

At the hearing in this court, petitioner's counsel presented additional evidence of other training sessions conducted by other assistant district attorneys on the subject of jury-selection. On behalf of petitioner, it is argued that the evidence as a whole demonstrates an official position on behalf of the District Attorney's Office as to the proper way to select a jury in a criminal case. I agree that this is a reasonable inference, but I do not conclude that it was the policy of the District Attorney's Office to discriminate on racial grounds in the process of selecting juries.

After all, it would be impossible to discuss the implications of the *Batson* decision, and the correct way to select juries in the wake of that decision, without mentioning the subject of race. The evidence makes clear that assistant district attorneys were urged to try to obtain juries which would be willing to convict, and to avoid jurors believed to be too favorable to the defense side of the case. It was important for assistant district attorneys to adhere to *Batson's* requirements, so as not to jeopardize convictions. It was equally important for assistant district attorneys to avoid being falsely accused of *Batson* error. The evidence shows that, at times, it was suggested to assistant district attorneys that, if they intended to challenge a prospective juror who was black, they should make sure that valid reasons were noted, in the event of a *Batson* challenge by the defense. While such instructions could conceivably be viewed as coaching assistant district attorneys to conceal violations of *Batson,* I believe the more reasonable interpretation is that all concerned were attempting to guard against false accusations of racial discrimination. In sum, I conclude that the "official policy" evidence is of minimal assistance to petitioner's contention, and that the issue must be resolved on the basis of what actually occurred at petitioner's trial.

The precise point made by Judge Fullam is that one cannot discuss the practical implications of the *Batson* decision without mentioning the subject of race. It is also significant that, in the *Bond* hearing held in December 2005 (nearly three

months before Mr. Nolas filed this Motion), the habeas petitioner's claim of a "policy" of discrimination was specifically disputed by the trial ADA whose notes from ADA Sagel's lecture formed the basis of the claim in *Bond* and are also a basis for the recusal motion here: "I was never instructed to strike people because of race, and, in fact, it says it right there [referring to notes], never strike because someone is Black." *Bond v. Beard* N.T., 12/1/05, at 13 (testimony of former ADA Gavin Lentz, Esq.).[5] It is telling that Mr. Nolas appended former-ADA Lentz's non-record notes, but did not bother to secure an affidavit from Mr. Lentz or include acknowledgment of this testimony, which is damaging to his allegations, and of which I suspect he was acutely aware.

Based upon the foregoing considerations, I find that the motion requesting my recusal should be, and it hereby is, denied.

---

5. The transcript of Mr. Lentz's testimony at the December hearing before Judge Fullam was provided to this Court in another capital PCRA appeal, where the defendant requested a pre-briefing remand based upon Mr. Lentz's notes of ADA Sagel's lecture. *Commonwealth v. Brown*, 439 CAP.