**UNITED STATES of America,**

v.

**Phillip Kelley BOBO, Don Eugene Siegelman, and Paul Michael Hamrick, Defendants.**

No. CR–04–S–200–W.

United States District Court,
N.D. Alabama,
Eastern Division.

June 30, 2004.

Alice H. Martin, US Attorney, Miles M. Hart, US Attorney's Office, Birmingham, AL, John Gibbs, Melissa Kay Atwood, Office of the Attorney General, Montgomery, AL, US Marshal, United States Marshal's Office, US Probation, United States Probation Office, Birmingham, AL, for United States of America.

William N. Clark, Redden Mills & Clark, Birmingham, AL, Robert D. Segall, Copeland Franco Screws & Gill, Montgomery, AL, Russell Jackson Drake, Whatley Drake LLC, Birmingham, AL, Ronald W. Wise, Montgomery, AL, for Defendants.

### ORDER AND MEMORANDUM OPINION

SMITH, District Judge.

The issue pending before the court is a question of public trust raised through a combination of this court's disclosures and, curiously, the actions of the party that, assuming the worst, would be presumed to benefit from the condition condemned.

The parties were allowed until this date to file declarations or motions concerning the issue of whether this judge should recuse. All parties have done so, except for the United States. The court has independently determined what it should do, however, and proceeds on its own to enter the following memorandum opinion and order.

The statutory provisions relevant to the issue are found at 28 U.S.C. §§ 144 and 455. Section 144 mandates recusal under the following circumstances:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

The pertinent provisions of 28 U.S.C. § 455 read as follows:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

. . .

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

. . .

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system; . . . .

## DISCUSSION—PART I

During a status conference held on June 9, 2004, the undersigned disclosed his kinship to the sitting Governor of the State of Alabama, Bob Riley, the person who defeated the former Governor, defendant Don E. Siegelman, during the 2002 general election. That disclosure was not required, because Governor Riley is not a party to this action, is not a lawyer in the case, will not be called as a material witness, and has no discernible interest that could be affected by the outcome of proceedings herein.[1] *See* 28 U.S.C. § 455(b)(5)(i)-(iv). Even if Governor Riley did fit any of the foregoing sub-parts of § 455(b)(5), the familial relationship does not mandate recusal. Moreover, this court does not possess any bias or prejudice for or against any party. *See* 28 U.S.C. §§ 144, 455(b)(1). The court nonetheless

---

1. Indeed, the only interest Governor Riley could (or should) have in the outcome of this case is, as Mr. Siegelman's attorney observed in a brief filed on June 25, 2004, a speculative, anticipatory, partisan advantage:

Upon being exonerated in this case, Governor Siegelman may once again seek election as Governor, and it is possible that current Governor Riley will run for reelection. Therefore, it is *possible* that the outcome of this case *might* have some *indirect* effect on Governor Riley's chances of reelection, *if* in fact he seeks reelection. But the time for any such reelection effort is two years away, which is an eternity in electoral politics.

Memorandum of Defendant Siegelman in Opposition to Recusal or Disqualification of District Judge (doc. no. 45), at 2–3 (emphasis in original).

made the disclosure for reasons that should be obvious: candor and fairness to the interests of defendants.

Yet, it is not defendants who question the ability of this court to preside fairly and impartially, but the government. The United States Attorney has stated that this judge's "distant relationship" to Governor Riley, plus mere attendance at private political functions for Bob Riley two years ago, "could raise some public confidence issues." [2] However, this judge made no contribution to the Riley campaign, and has not contributed financially to any other political candidate since becoming a member of this court.

The court presumes the United States Attorney's argument is based upon 28 U.S.C. § 455(a), stating that a judge must disqualify himself "in any proceeding in which his impartiality might *reasonably* be questioned." Clearly, none of the other provisions of § 455(b) apply.

However, the same argument was made and rejected earlier this year in connection with a motion for recusal filed in the United States Supreme Court, asking that Justice Antonin Scalia not participate in proceedings concerning whether Vice President Richard Cheney should be compelled to disclose the names of all private individuals who had regularly attended and fully participated in non-public meetings of the National Energy Policy Development Group when developing and recommending to President George W. Bush a national energy policy.[3]

The motion was based upon disclosure of the fact that, three weeks after the Supreme Court had agreed to hear the Vice President's appeal,[4] Justice Scalia (accompanied by one of his sons and a son-in-law) flew to southern Louisiana with Vice President Cheney, in the Vice President's airplane, for three days of duck hunting.[5]

---

**2.** Transcript of June 23, 2004 telephone conference with counsel (doc. no. 43), at 7.

**3.** The case in which the motion was filed was initiated in 2001 by a public interest law firm and a national environmental group in the U.S. District Court for the District of Columbia against the National Energy Policy Development Group ("NEPDG"), Vice President Richard B. Cheney (who had served as Chairman of the NEPDG), various Cabinet officers, other federal officials, and several private individuals (including, most notably, the former Chief Executive Officer of Enron, Kenneth Lay). See *Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F.Supp.2d 20 (D.D.C.2002). The plaintiffs sought "information concerning the activities of the NEPDG and its members in developing and recommending to President George W. Bush a national energy policy." *Id.* at 24. The district court denied defendants' motion to dismiss all claims and entered a series of orders compelling defendants to respond to plaintiffs' discovery requests, the most contentious of which sought disclosure of the names of all private individuals who had regularly attended and fully participated in non-public

meetings of the NEPDG. Vice President Cheney then filed an interlocutory appeal to the District of Columbia Circuit, seeking a writ of mandamus to vacate the district court's discovery orders, but a divided panel of the Court of Appeals dismissed the petition. See *In re: Cheney*, 334 F.3d 1096 (D.C.Cir.2003).

**4.** The Supreme Court granted the Vice President's petition for writ of *certiorari* on December 15, 2003. See *Cheney v. U.S. Dist. Court for Dist. of Columbia*, —— U.S. ——, 124 S.Ct. 958, 157 L.Ed.2d 793 (2003).

**5.** Subsequent media disclosures brought to light the fact that Justice Scalia and Mr. Cheney were old friends, "well acquainted (from [their] years serving together in the Ford administration)." *Cheney v. United States District Court for the District of Columbia*, —— U.S. ——, 124 S.Ct. 1391, 1393, 158 L.Ed.2d 225 (2004) (Scalia, J.). The thrust of the motion for recusal was the following argument:

Sierra Club makes this motion because ... damage [to the integrity of the system] is being done right now. As of today, 8 of

Justice Scalia denied the motion for recusal, saying that a decision about whether the impartiality of a United States justice or judge can *"reasonably* be questioned" under 28 U.S.C. § 455(a) should "be made in the light of the facts as they exist[ ], and *not as they* [are] *surmised or reported."* *Cheney v. United States District Court for the District of Columbia,* —— U.S. ——, 124 S.Ct. 1391, 1392, 158 L.Ed.2d 225 (2004) (Scalia, J.) (emphasis supplied). It is "well established," Justice Scalia observed, "that the recusal inquiry must be made from the perspective of a *reasonable* observer who is *informed of all the surrounding facts and circumstances." Id.* at ——, 124 S.Ct. at 1400 (emphasis in original) (citations and internal quotation marks omitted).[6]

Applying those standards, Justice Scalia concluded that recusal is required only when, "on the basis of established principles and practices, I have said or done something which requires that course," *id.* at ——, 124 S.Ct. at 1394, and he insisted that he had not.

This judicial officer affirms for the record of these proceedings that he also has not said or done anything that requires recusal, and none of the matters disclosed would impair this judge from a fair, thorough, and impartial review of the facts and law pertinent to this case, and just decisions in accordance with both. Further, this judge can affirm without equivocation that neither the fact he was nominated to this position by former President Clinton, a Democrat, nor the fact that he is related in the sixth degree ("second cousin") to the sitting Governor, a Republican, would influence any ruling. Finally, if Supreme Court Justice Scalia is not required to recuse himself from participation in a case of high national import when he spent three days with the principal defendant only three weeks after the Court agreed to hear that party's appeal, then *surely* this judicial officer is not compelled to step aside when he has not spent a total of three days with Bob Riley in thirty years.[7]

To be sure, political consequences could flow from judicial decisions on pre-trial

the 10 newspapers with the largest circulation in the United States, 14 of the largest 20, and 20 of the 30 largest have called on Justice Scalia to step aside.... Of equal import, there is no counterbalance or controversy: not a single newspaper has argued against recusal. Because the American public, as reflected in the nation's newspaper editorials, has unanimously concluded that there is *an appearance of favoritism,* any objective observer would be compelled to conclude that Justice Scalia's impartiality has been questioned. These facts more than satisfy Section 455(a), which mandates recusal merely when a Justice's impartiality "might reasonably be questioned."

*Cheney v. United States District Court for the District of Columbia,* —— U.S. ——, 124 S.Ct. 1391, 1399, 158 L.Ed.2d 225 (2004) (Scalia, J.) (emphasis added). As Justice Scalia observed, "The implications of this argument are staggering. I must recuse because a significant portion of the press, which is deemed to be the American public, demands it." *Id.*

**6.** *See also, e.g., United States v. Kelly,* 888 F.2d 732, 744–45 (11th Cir.1989) (holding that § 455(a) embodies an objective standard: *i.e.,* "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality") (quoting *United States v. Torkington,* 874 F.2d 1441, 1446 (11th Cir. 1989)) (quoting *Parker v. Connors Steel Co.,* 855 F.2d 1510, 1524 (11th Cir.1988) (quoting *Potashnick v. Port City Const. Co.,* 609 F.2d 1101, 1111 (5th Cir.1980))) (internal quotation marks omitted).

**7.** *See* Transcript of June 23, 2004 telephone conference with counsel (doc. no. 43), at 6 ("Bob Riley is one of only a few surviving members of the Riley family. He and I have lived busy lives. We rarely have seen one another during our adult lives. Those functions simply afforded some opportunities to visit and to attempt to rekindle family ties. If I am to be faulted for simply honoring those family relationships, then I accept it.").

motions, or verdicts rendered by a jury following trial on the merits of the government's indictment. Even so,

> *political consequences are not my concern* .... To expect judges to take account of political consequences—and to assess the high or low degree of them— is to ask judges to do precisely what they should not do. It seems to me quite wrong (and quite impossible) to make recusal depend upon what degree of political damage a particular case can be expected to inflict.

*Id.* at ——, 124 S.Ct. at 1397 (emphasis supplied).

That does not end discussion, however. There are other, very important, institutional interests that must be addressed, and it is to those issues the court now turns.

### DISCUSSION—PART II

The year 2004 finds many Americans disillusioned with government. As another judge of this court observed when ruling upon a government motion for recusal, we live in a "cynical world," one in which "accusation morphs into perception, and perception morphs into reality." *United States v. Woodward*, No. CR–00–J–213–S, slip op. at 1 (N.D. Ala. filed Apr. 21, 2004) (Johnson, J.).

The degree of cynicism and distrust infecting the decisions of all branches of government is disheartening. Worse, such lack of trust is dangerous to our evolving experiment in self-governance through a representative democracy.

As Justice Breyer observed, confidence in the integrity and impartiality of federal judges "is a public treasure.... It is a

vitally necessary ingredient of any successful effort to protect basic liberty and, indeed, the rule of law itself." *Bush v. Gore*, 531 U.S. 98, 157–58, 121 S.Ct. 525, 557, 148 L.Ed.2d 388 (2000) (Breyer, J., dissenting).

This court has no desire to contribute to the prevailing level of cynical distrust of pronouncements by public officials, but instead to confirm the integrity and impartiality of most members of the federal judiciary.

The promotion of both the virtue of impartiality and commitment to the rule of law are *precisely* the reasons the Framers of our Constitution vested the judicial power of the United States in justices and judges who are appointed for life, and who receive a compensation that cannot be diminished during their continuance in office. *See* U.S. Const., art. III, § 1.[8]

The wisdom of those provisions lies in the Framers's belief that Article III judges would thereby be unhinged from economic worries and previous political affiliations, and that each would be freed to become, in Blackstone's vivid phrase, "the living oracle of the law." It is upon that firm expectation that confidence in the integrity and impartiality of the federal judiciary has been erected—slowly, over many years, in case after difficult case.

Confidence in the institutional integrity of the judicial branch "cannot exist in a system that assumes [judges] to be corruptible by the slightest friendship or favor, and in an atmosphere where the press will be eager to find foot-faults." *Cheney, supra* at ——, 124 S.Ct. at 1402. Yet, that is exactly where the federal judiciary finds itself at the present moment as a result of

---

8. Article III, section 1 of the United States Constitution reads as follows:

> The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

> The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behavior, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

spurious suggestions for recusal that demonstrate

> an unstated lack of confidence in the impartiality and capacity of the [judge] who would make the critical decisions if [he remains in the case]. Otherwise, [the government's] position is wholly without merit. The endorsement of that position by the [United States Attorney] can only lend credence to the most cynical appraisal of the work .of judges throughout the land. *It is confidence in the men and women who administer the judicial system that is the true backbone of the rule of law.* Time will one day heal the wound to that confidence that [has been] inflicted by [motions such as this]. One thing, however, is certain.... [T]he identity of the loser is perfectly clear. *It is the Nation's confidence in the judge as an impartial guardian of the rule of law.*

*Bush v. Gore*, 531 U.S. at 128–29, 121 S.Ct. at 542 (Stevens, J., dissenting) (emphasis supplied).

Just as no responsible public official or reporter claiming the privilege of the First Amendment should insinuate that a United States district judge presiding in a case of this magnitude harbors a desire to aid the sitting Governor and his political interests, or is influenced by the political affiliations of the defendants, no judge should intentionally do anything that is damaging to confidence in the integrity and impartiality of the federal judiciary. Even the appearance of impropriety is a matter persuasive of remedial action. As this court stated in an order entered in another case almost two years ago:

> Ultimately, the power of the federal judiciary to act as a cementitious institution, binding the disparate and discordant elements of our democratic republic into an orderly whole, rests upon nothing more substantial than the ethereal virtue of persuasion *and the public's perception of principled decision-making.*

*Jenkins v. BellSouth Corp.*, No. CV–02–C–1057–S (N.D. Ala. filed Sept. 13, 2002), slip op. at 11 (emphasis added). This court steadfastly upheld the truth of that statement when it was issued, and confirms and embraces the principle again, in this context.

## CONCLUSION

For all of the reasons stated in Part II of this opinion, I conclude *sua sponte* that I should not preside over this case. Mr. Justice Brandeis once observed of the Supreme Court's role in American governance that "[t]he most important thing we do is not doing." Alexander Bickel, *The Least Dangerous Branch* 71 (1962). That observation also is sometimes true of trial courts. This is one of those times. To refrain from participation in a case of significant import to the entire State when such action would be tantamount to inflicting a wound upon a fundamentally important trust is the essence of the restraint required of Article III judges, appointed for life during good behavior—and so appointed *precisely* for the purposes of ensuring equal justice under law and sustaining public confidence in the integrity and impartiality of the judicial branch.

Accordingly, the Clerk is ORDERED to redraw the judicial assignment from the list of judges accepting criminal assignments through the use of this District's standard, neutral, randomized selection procedures on a date and at a time of which counsel for all parties are given advance notice, so they may be present and observe, if any so desire.